[Civ. No. 17887.   First Dist., Div. One.   Jan. 30, 1959.]

LAZAR DROPO et al., Respondents, v. CITY AND COUNTY
OF SAN FRANCISCO et al., Appellants.

454

Dion R. Holm, City Attorney, and Donald J. Kropp, Deputy City Attorney, for Appellants.

Appel, Liebermann & Leonard and Vladimir Vucinich for Respondents.

BRAY, J.—Defendants appeal from a judgment entered after jury verdict, awarding plaintiffs $26,000 for the wrongful death of their daughter as a result of being struck by defendants' streetcar.

### QUESTIONS PRESENTED

1. Admissibility of sections 51, 52, 21 and 62, Municipal Code.

2. Rejection of defendants' proposed instruction on tracks as a warning of danger.

3. Was deceased contributorily negligent as a matter of law?

4. Was the verdict excessive?

### FACTS

The accident occurred at the "K" line terminal owned by the San Francisco Municipal Railway adjacent to San Francisco City College. There the tracks form a loop of several hundred feet. There is a waiting station located there. The westerly section of the tracks parallels the college campus and is separated therefrom by a fence, 10 feet from the nearest rail. An asphalt pathway approximately 6 feet wide extends from the campus through a gate in the fence across the streetcar tracks to the terminal. Painted on the pathway is the word "Danger." The pathway is used for access to the terminal and on through to Ocean Avenue. The car was a one-man operated streetcar known as a streamliner. It overhangs the rails on each side 18-20 inches. The operator sits up front on the left hand side.

Lenore Dropo, the deceased, was in her second day at the college. Mrs. Edna Scholz testified that she was sitting in the

right front seat of the car, that she saw Lenore outside the campus gate walking on the pathway looking straight ahead. "[S]he walked and walked and I hollered and that's it." Lenore took seven or eight steps before she was hit. No one else saw her until she was about a step and half from clearing the tracks, where she was struck by the left front portion of the streetcar, which was then going 4-5 miles per hour. She was thrown 20 feet forward. Her body was found approximately one foot beyond the far rail. The car traveled 18 feet after the brakes were applied. The operator estimated that at 5 miles per hour the streetcar would stop within 8-10 feet after the application of the brakes. He testified that as he approached the pathway he saw no one in the vicinity; that he applied his brakes when he was a slight distance from the gate because he was approaching the gateway. He did not sound his gong. He looked both to his right and left within a few feet of the pathway. He first saw Lenore when "she just popped up" about 1½ feet from the right rail at which time the streetcar was already in the pathway. She was walking towards the tracks but looking away from the oncoming car. He put his brakes down to the floorboard. She was struck by the left front of the streetcar when she was a few inches from the far rail.

1. *Municipal Code.*

During World War II the operator worked for the Market Street Railway for two years as an operator of a one-man streetcar. He had then received seven days training for its operation. Since 1944 when the city took over that railway he worked as a conductor until two weeks before the accident. The "K" car and the cars of the Market Street Railway had different operating mechanisms, particularly different types of braking equipment. He had received three days of training with the Municipal Railway and had operated "K" cars for two weeks. Admitted in evidence were sections 51 and 52 of the Municipal Code. Section 51 provides: "Inexperienced platform men prohibited. It shall be unlawful for any person not having had previous experience to act as motorman, gripman or conductor on street railroad cars within the City and County of San Francisco, unless said person shall have had at least seven days' experience in such capacity in this City and County, under the instruction and guidance of a competent and experienced motorman, gripman or conductor, as the case may be . . ." Section 52 provides: " 'Experienced' motor-

men, gripmen and conductor, defined. The term 'competent and experienced motorman, gripman, or conductor' shall be defined to mean one who has had seven days' experience as expressed in Section 51 of this article, and any person not having had such experience shall be deemed to be incompetent and inexperienced.''

In its instructions the court read to the jury said sections 51 and 52 (as well as section 21 (requiring motormen to ring bell or sound gong) and section 62 (requiring cars to be equipped with fenders).) The court then said: ''Conduct which is in violation of the ordinances of the City and County of San Francisco *respecting the ringing of streetcar bells or gongs just read to you,* constitutes in itself negligence. . . . *In this connection,* you may assume that a person of ordinary prudence will reasonably endeavor to obey the law . . . To prove that a violation of an ordinance, *such as that charged in this case,* was excusable and justifiable to overcome the presumption of negligence, the evidence must support a finding that the violation resulted from causes or things beyond the control of the person charged with the violation. . . . However, in this action a violation of law or of an ordinance or of *any of the ordinances or sections* is of no consequence unless it was a proximate cause of or contributed as a proximate cause to an injury found by you to have been sustained or suffered by the decedent.'' (Emphasis added.)

It is true that in these instructions the court, strictly speaking, only stated that a violation of the ordinance concerning bells and gongs would constitute negligence. However, a reading of them, particularly the italicized portions, would give the jury the impression that the court was referring to all the sections of the ordinance which it had read. Certainly violations of sections 51 and 52 were ''charged in this case.'' At least, the court told the jury that to prove that the violations of sections 51 and 52 were justified defendant would have to show that the violations were due to causes beyond defendant's control. Therefore, we are required to determine whether the court erred in instructing concerning these sections.

■■■ Defendants objected to the introduction of these sections. The grounds of the objection, however, are not clear. When plaintiffs offered section 51 defendants' counsel stated, ''that's the section we discussed, to which we object as being inapplicable to this case.'' When section 52 was offered defendants' counsel stated, ''We have the objection, because that

refers to 51.'' There had been a discussion during the noon recess concerning these sections. The record fails to show whether the judge was present at the discussion or what the discussion was. As defendants contend that under the rule of statutory construction general language in an ordinance does not apply to government or its agencies unless expressly included therein by name, the ordinance could not be held to apply to defendant city, the objection that the ordinance was "inapplicable" may have been meant to cover that contention or that the ordinance was not material to the question of negligent operation or both. We are inclined to the view that in the view of both court and counsel it covered both and therefore that it was sufficient. *Pipoly* v. *Benson* (1942), 20 Cal.2d 366, 369 [125 P.2d 482, 147 A.L.R. 515], held that the failure to object to the admission of an invalid ordinance in evidence did not preclude objection upon appeal to an instruction based upon it. In *Nosbonne* v. *Brill*, 53 Cal.App.2d 436, 438-439 [128 P.2d 57], the court stated, ''each party is allowed, as a matter of law, an exception to every instruction. This last factor was also emphasized in *Pipoly* v. *Benson, supra.*'' However, in *Hearn* v. *Gunther*, 57 Cal.App.2d 82 [134 P.2d 3], the court held that failure to object to the admission in evidence of an ordinance did not bar the appellant from raising the invalidity of the ordinance on appeal, saying (p. 85) : ''. . . we are not precluded on appeal from reviewing the order of the court which erroneously construed the validity of the ordinance when it granted the nonsuit, where such order (granting a nonsuit) is deemed excepted to under section 647, *supra*. This was the effect of a portion of the decision in *Pipoly* v. *Benson, supra*.''

It is very doubtful if the rule of the Pipoly case would apply to a *valid* ordinance, to the introduction of which in evidence no objection was made. However, we deem it unnecessary to determine that question in view of the facts (1) that we find the objection to the introduction sufficient in this case and (2) we further find that under the peculiar circumstances of this case, sections 51 and 52 were admissible for the reason that the issue of the competency of the operator was injected in the case by defendants. In the opening statement defendants' counsel stated: ''. . . that Mr. Brown was a capable operator, a very capable street car man; that he had received some of his training with the old Market Street Railway, and when the City and County of San Francisco took over the Market Street Railway, he went with the Muni.''

The operator was called under section 2055, Code of Civil Procedure, as the first witness. No objection was made to the examination by plaintiffs concerning his competency to drive defendant city's streetcar including the time of his training with defendant city. On direct examination defendants' counsel asked him how long he had operated Market Street Railway cars and his training period with that company. These facts bring the introduction of sections 51 and 52 and the instruction concerning them under the rule set forth in *Megee* v. *Fasulis*, 65 Cal.App.2d 94 [150 P.2d 281], where the court said concerning an instruction on intoxication (p. 101) : "This element of the case was placed in issue first by counsel for the defendant in his opening statement to the jury, and later was again alluded to by both parties. Defendant cannot complain of an issue which he assisted in placing in evidence. By so doing he made it a part of his defense of contributory negligence."

The competency of the motorman having been made an issue, sections 51 and 52 became relevant.

The operator testified that at the time of the accident his speed was approximately 5 miles per hour as he started down the straightaway upon which the path is located; that at that speed if he took his foot off the deadman's control the streetcar would stop in "About six or seven or eight feet" and with brake application only it would stop in 8-10 feet. The streetcar went 18 feet after hitting the deceased. While the complaint did not allege negligence in the selection of the operator, the jury under the issue presented in determining whether the operator was negligent in the operation of the car, was entitled to know that because of lack of the training required by the ordinance, the operator was presumed to be incompetent. While, of course, there must be a causal connection between the violation and the injury (the court so instructed the jury), such connection is found here, in explanation of why the operator failed to see deceased before he did, to sound the gong, to approach a well used pathway under complete control and to stop the car in the distance he said he could stop it.

Inasmuch as the issue of the competency of the motorman was raised in the case by defendants and evidence on it introduced without objection, we deem it unnecessary to discuss cases like *Corsetto* v. *Pacific Electric Ry.*, 136 Cal.App.2d 631 [289 P.2d 116], and *Langford* v. *San Diego Elec. Ry. Co.*, 174

Cal. 729 [164 P. 398], which holds, as did the Corsetto case (pp. 634-635) that where the complaint contains no allegation as to negligence of the streetcar company in the training or employment of the motorman, ''The great weight of authority supports the rule that in actions of this kind the competency of the person claimed to have acted negligently, or his reputation for care, is not a subject of inquiry.'' In none of those cases was such issue raised by the defendant nor evidence admitted without objection by the defendant. For the same reason, cases like *Strandt* v. *Cannon* (1938), 29 Cal.App.2d 509 [85 P.2d 160] which hold erroneous instructions that the failure of an automobile driver to have a driver's license is prima facie evidence of incompetence, are not applicable here.

Defendants' contention that sections 51, 52, 21 and 62 do not apply to the Municipal Railway because it is not specifically mentioned in them is without merit. Defendants rely upon the rule expressed in *Balthasar* v. *Pacific Elec. Ry. Co.*, 187 Cal. 302, 305 [202 P. 37, 19 A.L.R. 452], to the effect that a fundamental rule of construction requires that general language in a statute shall not be construed to apply to the government or its agencies unless expressly included by name. However, that rule does not apply if application of the statute in question would not infringe upon sovereign governmental powers. The statutory construction rule ''is founded upon the principle that statutory language should not be interpreted to apply to agencies of government, in the absence of a specific expression of legislative intent, where the result of such a construction would be to infringe sovereign governmental powers. [Citations.] Where, however, no impairment of sovereign powers would result, the reason underlying this rule of construction ceases to exist and the Legislature may properly be held to have intended that the statute apply to governmental bodies even though it used general statutory language only.'' (*Hoyt* v. *Board of Civil Service Commrs.*, 21 Cal.2d 399, 402 [132 P.2d 804]; see also 45 Cal.Jur.2d p. 550 et seq., § 25, and 82 C.J.S. p. 554, § 317.) Obviously interpreting the ordinance to apply to defendant in its proprietary capacity in this particular respect, in nowise infringes its sovereign governmental powers. Moreover, the fact that since 1944 when the Market Street Railway went out of business the Municipal Railway has been the only one to which the ordinance could apply and the ordinance has never been repealed, is strong evidence that the ordinance was intended to apply to the Munici-

pal Railway. In *Nutter* v. *City of Santa Monica,* 74 Cal.App. 2d 292 [168 P.2d 741], the construction rule was applied to the construction of the Labor Code in a decision holding that because governmental bodies were not expressly mentioned in the Labor Code, its provisions requiring bargaining between employers and trade unions did not apply to the defendant city in its operating of local and intercity motor coach lines. Obviously, applying such a requirement to a municipality, even though it was acting in a proprietary capacity, would interfere with sovereign governmental powers. It was so held in that case. In stating the rule of construction the Nutter case said (p. 300) "general terms of a statute will not be construed as including government if the statute would operate to trench upon sovereign rights, injuriously affect the capacity to perform state functions or establish a right of action against the state." The construction we give the ordinance in nowise does any of these things (the right to sue the municipality for negligent operation of its streetcars is provided by statute). We have been cited to no case, and have found none, holding that the rule of construction applies to a municipality acting in its proprietary capacity where an ordinance, as here, is enacted for the safety of the public.

Defendants' contention that the evidence did not justify the instruction giving section 21, "The motorman . . . must always, by ringing the bell or striking the gong on such car, give timely warning of the approach of such car to pedestrians . . . and others who may happen to be on or about to cross the track in front of such car" is likewise without merit. While it is true that no persons other than Lenore were in the immediate vicinity of the crosswalk, Lenore was. It is a reasonable assumption that had the gong been seasonably sounded Lenore would not have been struck.

Defendants' contention that the fender required by section 62 is archaic is a matter for the board of supervisors to consider, not for the courts.

2. *Instruction That Tracks Are a Warning of Danger.*

Defendants took BAJI Number 203 which applies to railroads and not to street railroads and, as they say "adapted it." They cite no authority to support their instruction. As adapted to street railroads it is erroneous. The stop, look and listen rule embodied in the instruction has been held not to apply to streetcar tracks. (*Carey* v. *Pacific Gas & Electric*

*Co.* (1925), 75 Cal.App. 129 [242 P. 97] ; *Aungst* v. *Central California Traction Co.* (1935), 115 Cal.App. 113 [1 P.2d 56].) The court properly rejected it.

### 3. *Contributory Negligence As a Matter of Law.*

■ The court properly gave an instruction to the effect that there was a presumption that deceased used due care and was obeying the law. No contention is made that the presumption was not applicable. ■ "This presumption is itself evidence sufficient to create a conflict with the evidence produced by defendant, and requires that the issue of contributory negligence be submitted to the jury." (*Simon* v. *City & County of San Francisco* (1947), 79 Cal.App.2d 590, 598 [180 P.2d 393].) ■ Thus, regardless of the state of the other evidence, there was a conflict on the issue of contributory negligence for the jury to resolve. Therefore we cannot say as a matter of law that Lenore was contributorily negligent.

### 4. *Verdict.*

■ Lenore was 17 years old. The jury awarded $26,000 for her wrongful death. Defendant contends that that amount is excessive. ■ In wrongful death cases the awarding of damages is a matter committed to the discretion and sound judgment of the jury, whose conclusion will not be disturbed on appeal unless the sum is so disproportionate to the injury proved as to justify the view that it was given under the influence of passion and prejudice (*Bechtold* v. *Bishop & Co., Inc.* (1939), 16 Cal.2d 285, 294 [105 P.2d 984] ; " ' ". . . so plainly and outrageously excessive as to suggest at first blush passion, prejudice or corruption . . ." ' " (*Arellano* v. *City of Burbank,* 13 Cal.2d 248, 258 [89 P.2d 113]) ; "so disproportionate to the injuries suffered that the result may be said to shock the conscience . . ." (*Daggett* v. *Atchison, T. & S. F. Ry.,* 48 Cal.2d 655, 666 [213 P.2d 557]). ■ The Daggett case states, although each case must be determined on its own facts, a reviewing court may consider amounts awarded in similar cases. There it was held that it could not be said as a matter of law that a verdict of $50,000 for the loss of two minor children (ages 3 and 10) was so greatly excessive as to shock the conscience. Moreover, defendants do not contend that the instructions on damages were incorrect, nor do defendants contend that the verdict was so disproportionate as to shock the conscience or to show passion or prejudice. We

cannot say that under the present day value of the dollar the verdict was excessive.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied February 27, 1959, and appellants' petition for a hearing by the Supreme Court was denied March 25, 1959.