[Civ. No. 30747. First Dist., Div. Two. Jan. 22, 1975.]

GEORGE LAREAU et al., Plaintiffs and Appellants, v.
SOUTHERN PACIFIC TRANSPORTATION COMPANY et al.,
Defendants and Appellants.

[Civ. No. 31390. First Dist., Div. Two. Jan. 22, 1975.]

SOUTHERN PACIFIC TRANSPORTATION COMPANY, Plaintiff
and Appellant, v.
GEORGE LAREAU et al., Defendants and Respondents.

## COUNSEL

Boccardo, Blum, Lull, Niland, Teerlink & Bell, Edward J. Niland and Stanley A. Ibler, Jr., for Plaintiffs and Appellants in No. 30747 and for Defendants and Respondents in No. 31390.

Bledsoe, Smith, Cathcart, Johnson & Rogers, Bledsoe, Smith, Cathcart, Boyd & Eliot, Robert A. Seligson, Kenneth E. Nussbaum, Wines, Coffee & Robinson and B. K. Wines, Ropers, Majeski, Kohn, Bentley & Wagner and Michael J. Brady for Plaintiff and Appellant in No. 31390 and for Defendants and Appellants in No. 30747.

## OPINION

**TAYLOR, P. J.**—These consolidated appeals arise out of two successive collisions in which plaintiffs, George and Margaret Lareau, were injured and their mentally retarded son killed. The Lareaus appeal from the judgment on a verdict in favor of defendants, Southern Pacific and the City of Sunnyvale, in their wrongful death action, contending that the trial court erred in refusing their proffered instruction that after they met their initial burden of proof the burden of proof on causation shifted to the defendants. Southern Pacific cross-appeals from the judgment entered on the jury verdict for $125,000 in favor of Mrs. Lareau in her action for personal injuries and from a judgment of dismissal entered after a demurrer was sustained without leave to amend in its subsequent action for declaratory relief. Southern Pacific contends that the trial court should have exercised its equitable powers to determine the good faith of the prejudgment settlements made by the Lareaus with two of the other

tortfeasors and required disclosure to examine the allocations made to the wrongful death and personal injury causes of action.

For the reasons set forth below, we have concluded that the judgments in the wrongful death, personal injury and declaratory relief actions should be affirmed, and that Southern Pacific may file a separate action to litigate the issues of good faith and damages raised by the settlements, as well as its own conduct in regard to settlement.

The record reveals the following chronology: the first accident occurred at 9:30 a.m. on Saturday, September 20, 1969, when an automobile driven by defendant Belgarde and owned by defendants Gonzales struck the Lareau vehicle at the intersection of the Southern Pacific tracks and Mary Avenue in Sunnyvale. The Lareau vehicle was traveling north on Mary Avenue when it was struck by the Belgarde vehicle proceeding west through the red light at a speed estimated from 50-75 miles per hour. The impact of the first collision spun the Lareau vehicle around so that it landed with its right rear portion over the southernmost railroad tracks.

Mr. Lareau, then 56, who was driving, was injured and removed from the vehicle. The Lareaus' 27-year-old mentally retarded son, George II, who was in the back seat directly behind his father, sustained a head wound. Mrs. Lareau, then 62, who was in the passenger seat, received some lacerations but was ambulatory. Immediately after the first collision, Mrs. Lareau held George in the back seat and called for help. She saw a cut on George's head above his eye, but did not know whether he was conscious.

Ernest Carballo, who was stopped at the intersection and heard the crash, parked and ran to the Lareau vehicle. George was lying in the back seat with blood coming down his face from a head wound but not out of his eyes, ears or mouth.

Officer Sternola of the Sunnyvale Public Safety Department administered first aid and checked George for excessive bleeding. George was bleeding severely from the eyes, ears and mouth. Officer Sternola laid George's head on the edge of the seat so he would not drown in his own blood. Sternola saw a large gash on his head and heard gurgling. He had no problems stopping the bleeding. Charles Robinson, another eyewitness who saw the impact between the vehicles and immediately rushed to the scene, noticed that George was unconscious and breathing rather hard.

When Officer Biehn of the City of Sunnyvale arrived at the intersection a few moments after the first collision, he saw that George was lying in the back seat of the car while Mrs. Lareau was standing outside consoling him. He did not observe any facial lacerations on George but noticed that he was unconscious. Officer Biehn administered first aid to Mrs. Lareau.

Ernest Carballo first saw the train when it was about three-fourths of a mile away. An officer got two flares and sent people down the tracks to stop the train. When Carballo saw the train coming, he told one of the officers to get the boy out of the car but the officer replied that the train was going to stop. When the train was 250-300 yards away, Carballo again pleaded with the officer to get the boy out of the car but the officer indicated the train was going to stop. Mrs. Lareau and another bystander were also assured by the officers that the train would stop.

Officer Biehn knew that the trains frequently passed over the Mary Avenue crossing, as the tracks were used by both freight and passenger traffic between the peninsula and San Francisco. Biehn knew the tracks would be used at some time but had no exact idea when. Shortly after his superior, Lieutenant Hoback, arrived, Biehn suggested that Southern Pacific be notified to stop the train. Hoback informed him that the information had already been communicated to Southern Pacific.

Lieutenant Hoback indicated that when he arrived at the scene of the accident, he went over to Officer Biehn who was then standing near the Lareau automobile. After checking the scene and the Belgarde vehicle and a brief discussion with Officer Sternola, Hoback went over to the Lareau vehicle and saw that Officer Biehn was then attending Mrs. Lareau's wounds. When Hoback saw that the Lareau vehicle was partially on the tracks, he radioed the police dispatcher to notify Southern Pacific to stop the trains and also to relay the information to the Mountain View Police Department. He then returned to the Lareau vehicle and never ascertained whether Southern Pacific or the Mountain View Police Department had been successfully contacted.

The first communication from Hoback to the Sunnyvale dispatcher was logged at 9:36:40. At 9:37:20, Hoback radioed for the Mountain View Police Department to set out flares. The Sunnyvale dispatcher called the Mountain View Police Department at 9:37:20. Ten seconds later, the Mountain View Police Department answered and was informed of the accident involving major injuries at Mary Avenue. The dispatcher

also asked for flares on the tracks and added: "We're calling SP right now to get them. Sometimes it doesn't do much good to call them." At 9:37:45, Officer Sternola asked the dispatcher whether Southern Pacific had been notified that the southernmost track was blocked. The dispatcher's reply indicated that the inquiry had been received but there was no response. The dispatcher called Southern Pacific at 9:38:20. The train hit the Lareau vehicle at 9:39:25. No radio call was received in the engine until about seven-eight minutes later.

David Pattison, the locomotive engineer of the train, sat on the right hand side of the cab in the direction of travel; Donald Lessi, the fireman, sat on the left side. Their eye level in the cab was about 15 feet above the ground. Before reaching the Mary Avenue crossing, the train (one locomotive and two double-deck passenger cars) had made its last scheduled stop at Mountain View. The next scheduled stop was at Sunnyvale about 2.7 miles from Mountain View and .9 miles beyond Mary Avenue. The train was due at Sunnyvale at 9:39, but was about a minute late.

After leaving Mountain View, the train attained a maximum speed of 65 miles per hour. About three-fourths of a mile from the Mary Avenue intersection, Pattison saw a large number of people. As this was an unusual occurrence on a Saturday morning, he started to reduce his speed by three to five miles an hour. Accordingly, half a mile from the Mary Avenue intersection, the train was going around 60 miles an hour. Pattison did not give the train a real application of brakes until he put it into emergency about a quarter of a mile away from the intersection. He saw people attempting to wave him down[1] but did not see the Lareau vehicle until he was about 100[2] feet from the intersection because of the people surrounding it. He could have come to a normal stop from a speed of 70 miles an hour within half a mile, or less, without use of the emergency brake. If the brakes had been applied 160, 170 or 200 feet earlier, the Lareau vehicle would not have been hit.

The estimates of the speed of the train at the time of the impact ranged from 10 to 30 miles an hour. When the train struck the Lareau

---

[1] Two other futile attempts were made to stop the train by several other witnesses who saw the train when it was about a mile away, and ran down the tracks waving their shirts.

[2] Lessi first saw the car when the train was about 200 feet from the intersection and was traveling between 65-70 miles per hour. About half a mile before the crossing, there was a slight reduction of speed. Lessi had full authority to put the train into emergency and could have done so without asking Pattison.

vehicle, the open rear door struck Mrs. Lareau who had broken away from the officers and gone back to get her son just before the train arrived. The impact threw Mrs. Lareau across the parked patrol car and smashed the window. She was then flipped into the air and thrown to the pavement approximately in the middle of the intersection. The impact of the train collision also knocked the Lareau vehicle with George in it all the way across the intersection, about 200 feet. The right rear of the Lareau vehicle was hanging onto the rear of the engine; the front end of the engine stopped 100-150 feet beyond the point of impact.

After the second collision, Hoback again observed George and noticed no difference in his appearance or position. Officer Sternola again checked for life signs, as he did after the first collision, and as far as he could tell, there was no change or increase in George's injuries. While they were in the ambulance on the way to the hospital, Mrs. Lareau held her son's hand. When she felt his hand go limp, she said to the police officer that she thought George had died. The patrolman replied: "Lady, your son is all right. I got oxygen on him." Two days later, the Lareaus were informed of George's death.

During the trial of the instant action, the Lareaus settled with defendants Belgarde and Gonzales for $60,000; a dismissal was entered. In addition, in exchange for a covenant not to enforce the judgment, the Lareaus also agreed to the settlement of Mrs. Lareau's personal injury action and the wrongful death action for $70,000 with the city. The latter was not revealed to the jury which subsequently returned a verdict in favor of the city and Southern Pacific in the wrongful death action and in favor of Mrs. Lareau in her personal injury action against Southern Pacific and the city for $125,000. After the trial court denied its motions for a determination of the good faith of the apportionment of the settlements, Southern Pacific filed its action for declaratory relief.

We turn first to the Lareaus' appeal from the judgment on the verdict in favor of the city and Southern Pacific in the wrongful death action. On this appeal. the only contention concerns the trial court's refusal of the Lareaus' proffered instruction concerning the shift of the burden of proof.

The record indicates that the Lareaus proffered an instruction (set forth in full in the footnote below)[3] which stated that once they had

---

[3]Proffered instruction: "In this action, the plaintiffs have the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues:

established the facts necessary to show that the negligence of a defendant was the proximate cause of the injuries suffered by George and the nature and extent of the injuries, the burden of proof shifted to the defendants to show that their negligence was not a proximate cause of George's death. After a discussion in chambers, the trial court rejected the Lareaus' proffered instruction and modified it to the usual instruction[4] that the plaintiffs had the burden of proof.

The Lareaus rely on *Haft* v. *Lone Palm Hotel,* 3 Cal.3d 756 [91 Cal.Rptr. 745, 478 P.2d 465]. In that recent case, our Supreme Court held that the absence of witnesses, where the defendant hotel owners negligently failed to provide a lifeguard for the hotel swimming pool in which Mr. Haft and his son drowned, warranted a shifting of the burden of proof as to proximate cause. The court reasoned that because of the negligence of the defendants in not having the lifeguard, there was an uncertainty as to what had actually transpired. The court cited *Summers* v. *Tice,* 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91], where the plaintiff was wounded by a bullet after two hunters fired guns simultaneously. There, the burden of proof on proximate cause was shifted as there was an uncertainty as to which of the several defendants was responsible for the plaintiff's injuries and the circumstances were such that only one of the defendants was liable. In *Haft,* the court also referred to its prior decision in *Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], permitting recovery on the basis of res ipsa loquitur for injury negligently caused to an unconscious patient.

The Lareaus readily concede that the facts of the instant case are not analogous to the *Haft, Summers* or *Ybarra* situations but urge that the

"[1] Negligence of defendants Southern Pacific Company and City of Sunnyvale.

"[2] That the negligence of a defendant was a proximate cause of the personal injuries suffered by plaintiffs George Lareau and Margaret Lareau, and of the death of George Lareau II.

"[3] Nature and extent of plaintiffs' injuries and damages. If you find that the defendants, or any of them, were negligent, such defendant, or defendants, have the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issue:

"[1] That such negligence was not a proximate cause of the death of George Lareau II."

[4] The instruction given read as follows, so far as pertinent: "In this action, the plaintiffs have the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues:

"1. Negligence of defendants Southern Pacific Company and City of Sunnyvale.

"2. That the negligence of a defendant was a proximate cause of the personal injuries suffered by plaintiff Margaret Lareau and the death of George Lareau, II.

"3. Nature and extent of plaintiff's injuries and damages."

burden of proof should have been shifted here as George's death was by its nature a unitary and indivisible catastrophe. The Lareaus' argument finds support in the following portion of the *Haft* opinion based on earlier authorities: "Moreover, our conclusion draws additional support from sources other than *Summers* and *Ybarra,* for the judiciary has responded to the uncertainties of proof inherent in a variety of parallel situations by shifting the burden of proof to a clearly negligent party. Thus, for example, when a plaintiff's injuries result from a combination of a tortfeasor's negligence and an innocent cause but the injuries are not readily susceptible to allocation between the two, our courts have required the negligent party to bear the burden of proving the extent of the damages resulting from his conduct [citations]; if he cannot sustain that burden, he is held liable for the entire loss. Similarly, when several negligent automobile drivers, not acting in concert, successively collide with a plaintiff's person or his property, and the resulting damage is not capable of apportionment, the burden 'shifts to *any defendant who might have contributed to the injuries* to prove his own *innocence* or limited liability by showing that such injuries or some particular injury did not result from his negligent conduct.' (Italics added.) (100 A.L.R.2d 16, 59 (summarizing the rule of *Cummings* v. *Kendall* (1940) 41 Cal.App.2d 549, 558-559 [107 P.2d 282]; *Copley* v. *Putter* (1949) 93 Cal.App.2d 453, 457-458 [207 P.2d 876]; *Eramdjian* v. *Interstate Bakery Corp.* (1957) 153 Cal.App.2d 590, 607-608 [315 P.2d 19]; and *Apodaca* v. *Haworth* (1962) 206 Cal.App.2d 209, 214-215 [23 Cal.Rptr. 461]).)" (P. 774.)

We agree that the instant case falls in this type of situation described above where the shift of the burden is predicated *not* on any uncertainty as to negligence, but on the inherent impossibility of apportioning the damages because of the type of injury involved. As stated by Prosser, Law of Torts (4th ed.) at page 315, "Certain results, by their very nature, are obviously incapable of any logical, reasonable, or practical division. Death[5] is such a result . . . ."

These considerations are not met by Southern Pacific's contention that

---

[5]While our research has disclosed no California case that precisely so holds, we think the proposition is not arguable. Prosser, *supra* at page 314, notes *People* v. *Lewis,* 124 Cal. 551 [57 P. 470] where the jury could have concluded that the manslaughter victim died as the result of both his self-inflicted knife wound and the earlier gunshot wound inflicted by the defendant. *Hackworth* v. *Davis* (1964) 87 Idaho 98 [390 P.2d 422], also cited by Prosser, held that failure to give an instruction on a single indivisible fatal injury sustained as the result of two separate automobile collisions was prejudicial error.

George's injuries were caused primarily by the first collision.[6] Southern Pacific's argument is based on the testimony of Officer Sternola who checked George's condition after each collision and noted no difference in his condition. Southern Pacific's argument, however, ignores the uncontroverted evidence that George survived both collisions and the difference in the impact of the two collisions on the Lareau vehicle. In the first, the Lareau vehicle was spun around; in the second, the vehicle was knocked 200 feet across the intersection. ■ We conclude that while we agree that the court erred in rejecting the Lareaus' instruction on shifting the burden of proof as to the wrongful death action, as discussed in detail below in relation to the apportionment of the settlements, we do not think the error in the instant case was prejudicial.[7]

We turn, therefore, to Southern Pacific's appeal from the judgment on the verdict in favor of Mrs. Lareau for $125,000 and the judgment of dismissal in its subsequent declaratory relief action. On this appeal, Southern Pacific urges that the trial court should have exercised its equitable power to inquire into the fairness of apportionment of the settlements made by the Lareaus with Belgarde and the city.

The additional pertinent facts are as follows: Mr. Lareau, who was injured only in the first collision, suffered from broken ribs and a broken wrist and collapsed lung. He could not work for about six months and had medical expenses of $3,661. Mrs. Lareau, who suffered lacerations and was ambulatory after the first collision, sustained extensive permanent crippling injuries after the train collision. Her medical expenses alone amounted to $23,287.66. All participants below agreed that Mrs. Lareau's cause of action was substantial and was worth a far greater amount than Mr. Lareau's personal injuries or Lareaus' action for the wrongful death of George, who was 27 years old, mentally retarded, lived at home and had never been gainfully employed.

On the fourth day of trial, the Lareaus settled with defendant Belgarde for $60,000, the full amount of his available insurance coverage. The

---

[6]*Thornton* v. *Luce,* 209 Cal.App.2d 542 [26 Cal.Rptr. 393], also cited by Southern Pacific in support of its argument, is distinguishable. In *Thornton,* there were multiple collisions as the result of a single impact between multiple unrelated plaintiffs and multiple unrelated defendants. On appeal, the court held it was error but not prejudicial to give an instruction shifting the burden of proof without specifying the particular set of plaintiffs and defendants to whom it applied.

[7]As a result of the allocation to the wrongful death cause of action of $29,000 from the Belgarde settlement and $65,000 from the city's settlement, the Lareaus' total recovery for the death of George was $94,000.

precise terms of the Belgarde settlement or allocation of the $60,000 among the three separate causes of action were not revealed to the court and the parties were not asked to do so.

Subsequently, counsel for Southern Pacific learned that the $60,000 received from Belgarde was apportioned as follows: $30,000 for Mr. Lareau's injuries and $1,000 for the injuries to Mrs. Lareau; $29,000 for the wrongful death cause of action. Southern Pacific objected on the ground that this apportionment was inequitable and obviously unrelated to the actual value of the claims and moved that the amount of the apportionment be disclosed to the court for its consideration of the equities.

On the fifth day of trial, the Lareaus and the city entered into an agreement for a settlement of $70,000 for Mrs. Lareau's injuries and the wrongful death cause of action, in exchange for a covenant not to enforce the judgment. Southern Pacific also brought this to the attention of the court and moved that the full details be disclosed, and that the city not be allowed to continue to participate in the action. The Lareaus and the city admitted a valid agreement but refused to spell out its terms. Southern Pacific's motion was denied.[8] Subsequently, Southern Pacific discovered that the parties had agreed that the $70,000 received from the city would be allocated as follows: $65,000 to the wrongful death cause of action and $5,000 for the injuries to Mrs. Lareau. Thereafter, the Lareaus' attorney increased his settlement demand to Southern Pacific from $70,000 to $100,000. After the verdict in favor of Mrs. Lareau against Southern Pacific and the city for $125,000, Southern Pacific was advised in writing by Mrs. Lareau's counsel that since Mrs. Lareau was to receive $1,000 from Belgarde and $5,000 from the city, Southern Pacific was to pay the balance of the judgment or $119,000, plus taxable costs and interest. On its motion for a new trial, and in its subsequent action for declaratory relief, Southern Pacific again raised the question of whether the allocation of the settlements as outlined above was equitable.

Southern Pacific readily concedes that pursuant to section 875 of the Code of Civil Procedure, it cannot claim contribution from either Belgarde or the city,[9] but argues that the trial court should have

---

[8]The motion for disclosure was renewed and again denied.

[9]As no judgment was rendered against Belgarde, no right to contribution would arise under section 875 of the Code of Civil Procedure. In any event, under section 878 of the Code of Civil Procedure, no right of contribution arises until after one tortfeasor has by payment discharged the joint judgment or paid more than his pro rata share thereof.

examined the good faith of the allocation of the settlement in the instant case, pursuant to section 877 of the Code of Civil Procedure (set forth in full below),[10] as interpreted in *River Garden Farms, Inc.* v. *Superior Court,* 26 Cal.App.3d 986 [103 Cal.Rptr. 498].

In that case, a fire broke out while the father was painting a cottage furnished to him by his employer, River Garden, as part of his compensation. Both parents were killed and the two minor children severely burned and left with permanent disfigurements and physical handicaps. Three of the defendants were released after an aggregate settlement of the children's wrongful death and personal injury claims was approved by the court,[11] without notice to the only remaining defendant, River Garden. The aggregate settlement of $1,290,000 was apportioned by the minor plaintiffs excessively toward the causes of action for the wrongful death of the parents so that in the event of verdicts against *River Garden,* the potentially larger verdicts for the injuries to the children would receive the least credit from the settlements, and the potentially lesser verdict for the wrongful death of the mother, the larger credit.

In *River Garden,* after an exhaustive discussion of the legislative purpose and history of the good faith clause of section 877, the court said at page 996: "If the limited objectives of the California law allowed a well-armed plaintiff to pick off his antagonists one by one, he would at least be compelled to abide by the moral standard signified by the demand for good faith release.

"The notion of collusion advanced by the Uniform Law Commissioners implies something more than mere confederacy. Any negotiated settlement involves cooperation, but not necessarily collusion. It becomes collusive when it is aimed to injure the interests of an absent tortfeasor. Although many kinds of collusive injury are possible, the most obvious

---

[10]"Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given *in good faith before verdict* or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—

"(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and

"(b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors." (Italics supplied.)

[11]As the appellate court noted at page 1002, judicial approval of the allocation occurred only because the claimants were minors. (Code Civ. Proc., § 372; Prob. Code, § 1431.)

and frequent is that created by an unreasonably cheap settlement. Applied *pro tanto* to the ultimate judgment, such a settlement contributes little toward equitable—even though unequal—sharing. As we noted earlier, unreasonably low settlements with the other tortfeasors and the fear of a large unshared judgment may propel the last remaining defendant into a settlement exceeding the plaintiff's remaining damages and transcending that defendant's equitable share. Prevention of collusion is but a means to the end of preventing unreasonably low settlements which prejudice a nonparticipating tortfeasor. The price of a settlement is the prime badge of its good or bad faith.

"Construed in the light of the legislation's objectives, the good faith release clause extends the obligation of good faith *beyond the parties to the negotiations, embracing an absent tortfeasor.* The latter has a financial stake in the amount of the settlement and thus a justiciable interest in the question of good faith. . . ." (Italics supplied.)

· ■ The above discussion disposes of the Lareaus' contention that Southern Pacific has no standing to raise the question of the good faith allocation of the settlement in the instant case. In addition, the court's subsequent discussion of the good faith requirement disposes of the Lareaus' contention that it is not a workable one. The court continued at pages 997 and 998: "A standard so nebulously expressed imposes no great hardship on settlement negotiators. An analogous problem exists when an insurance carrier is called upon to exercise good faith in accepting or rejecting an offer to settle within the limits of its policy. The carrier's duty of good faith extends beyond fraud or dishonesty and encompasses any kind of unfair dealing. [Citation.] In the decisions involving wrongful refusal to settle, price is the immediate signal for the inquiry into good faith, but only one of the many factors influencing the finding. [Citations.] So it is here.

"In viewing the good faith provision of section 877 as an aid to equitable sharing, one must not overlook the statutory objective of encouraging settlements and assuring them a measure of finality. A potential defendant's desire for settlement is blunted when he cannot close his file on the case. [Citations.] *The goals of equitable sharing and settlement finality compete with each other.* If the good faith clause demands equitable sharing as fixed by a jury verdict which has not yet taken place, the parties cannot negotiate safely, cannot accomplish settlement with a fair assurance of finality. All involved in the personal injury settlement business are aware of its large imponderables—the risk

of victory or defeat at the jury's hands, the risk of a high or low verdict, the unknown strengths and weaknesses of defenses, the inexact appraisal of damage elements, the defendant's solvency and the extent of insurance coverage. In advance of a jury verdict, most cases permit only a rough assessment of value. When one tortfeasor chooses to settle and another chooses to litigate, inequality in the ultimate cost does not signalize bad faith. [Citation.]

"On the other hand, if the policy of encouraging settlements is permitted to overwhelm equitable financial sharing, the possibilities of unfair tactics are multiplied. *Neither statutory goal should be applied to defeat the other.* If the statute is to work well, the demand for good faith settlement should find its role as an accommodating factor between undesirable extremes.

"Applied to strike a balance between the dual statutory objectives, the good faith clause should not invalidate a settlement within a reasonable range of the settlor's fair share. The price levels are not as unpredictable as one might suppose. Despite the uncertainties, generalized valuation criteria are recognized by the personal injury bar, insurance claims departments and pretrial settlement courts. *When testing the good faith of a settlement figure, a court may enlist the guidance of the judge's personal experience and of experts in the field. Represented by knowledgeable counsel, settlement negotiators can predict with some assurance whether a settlement is within the reasonable range permitted by the criterion of good faith.* The danger that a low settlement violates the good faith clause will not impart uncertainty *so long as the parties behave fairly* and *the courts maintain a realistic awareness of settlement imponderables.*" (Italics supplied.)

The court then indicated that good faith was a question of fact that could be raised by answer to be tried as a separate defense (Code Civ. Proc., § 597) or in a separate trial (Code Civ. Proc., § 1048), or by an action for declaratory relief.

It is true that in *River Garden* the question arose before the trial against the remaining defendant. However, it is only reasonable that the question of the good faith of the apportionment of the settlements with the other defendants, under the rationale of *River Garden,* should likewise be subject to some form of judicial determination after the completion of the trial and the establishment of liability on the part of the remaining defendant (in this case Southern Pacific). We recognize, of

course, that neither the parties nor the court below had the benefit of the *River Garden* case, decided on July 31, 1972, long after all of the rulings in the instant appeals.

In *River Garden,* at page 997, in language particularly apt here, the court indicated that by the good faith requirement of section 877 of the Code of Civil Procedure, "The Legislature has here incorporated by reference *the general equitable principle of contribution* law which frowns on unfair settlements, *including those which are so poorly related to the value of the case as to impose a potentially disproportionate cost on the defendant ultimately selected for suit.*" (Italics supplied.)

We see nothing in the overall settlement figures that is so disproportionate as to indicate bad faith.[12] However, as we noted above, although all agreed that while Mrs. Lareau's personal injury action was potentially the most valuable, the settlement value of the Lareaus' wrongful death cause of action was minimized because George was a permanently dependent adult,[13] and because George was seriously injured in the first collision. The trial court evaluated a $50,000 upper limit on the wrongful death cause of action, and $150,000 for Mrs. Lareau's personal injury action. The amount apportioned to the wrongful death cause of action was $29,000 from the Belgarde settlement, and $65,000 from the city's settlement, a total of $94,000.

As for the Lareaus' argument that their counsel was simply exercising his duty to assure maximum recovery for them, *River Garden* indicates

---

[12]As the court in *River Garden* also said, at page 997, "When one tortfeasor chooses to settle and another chooses to litigate, inequality in the ultimate cost does not signalize bad faith." However, the allocation of both settlements is somewhat indicative of bad faith. Even following the excellent guidelines for a bad faith agreement, set forth in *River Garden,* we cannot determine the question here as no hearing was held and no evidence was introduced on the subject.

[13]Under the California wrongful death statute, the heirs of the decedent may recover for the pecuniary loss of present and future benefits including the present value of the future contributions, the value of any personal service, advice or training, and the pecuniary value of the deceased's society and companionship (4 Witkin, Summary of Cal. Law (8th ed.) Torts, § 891, pp. 3180-3181). As stated in the recent annotation in 49 A.L.R.3d 934, at page 938, the principal element in the parents' action for the wrongful death of a minor child is the probable contributions by the child, had he lived, to the parents. (*Correia* v. *Van Camp Sea Food Co.,* 113 Cal.App.2d 71 [248 P.2d 81]; *Dropo* v. *City & County of S.F.,* 167 Cal.App.2d 453 [334 P.2d 972].) In the instant case, George, a 27-year-old mentally retarded adult who lived at home, the element of society and companionship could have only a minimal pecuniary value that would have to be offset by the prospective cost of his support (cf. *Fields* v. *Riley,* 1 Cal.App.3d 308 [81 Cal.Rptr. 671]).

that this duty is tempered by the statutory duty of a good faith settlement. Although our research has not disclosed any authorities to provide guidance as to what a reasonable amount of settlement would have been in the instant case, the total of $94,000 is, at least arguably, a disproportionate amount for George's death. Thus, we cannot conclude, as a matter of law, that the allocation in the settlement agreement *raises no issue as to the good faith of the settling parties.*

■ While we recognize that the appellate court in *River Garden* indicated at page 1002 that the good faith issue could be litigated under certain circumstances within the framework of tort actions or in an action in declaratory relief, we think the more appropriate procedure here is a separate trial after judgment. The remaining defendants' case against the plaintiff and the settling defendants arises not alone by virtue of a questionable allocation in the settling agreements but also as a result of an adverse judgment in the tort action imposing an allegedly disproportionate burden. Thus, the judgment against Southern Pacific and in favor of Mrs. Lareau has given Southern Pacific an accrued cause of action against the plaintiff and settling defendants for an alleged past wrong and, under these circumstances, the trial court did not abuse its discretion in denying declaratory relief (3 Witkin, Cal. Procedure (2d ed.) p. 2342).

As Justice Friedman noted in *River Garden,* good or bad faith is *a question of fact.*[14] The trial after judgment may require evidence substantially different in content and character than was adduced in the main tort action.[15] The conduct and motivations of all parties in regard to settlement will be in question. The refusal of a defendant to

---

[14]The parties are entitled to a trial by jury in such a case since "[t]he violation of a statute supplies to any person within the statute's protection a right of action to recover damages caused by the violation. [Citations.] *The nonsettling tortfeasor has a civil claim for damages against the claimant who exercised bad faith.*" (*River Garden Farms, Inc.* v. *Superior Court, supra* at p. 1001; italics added.)

[15]Southern Pacific, for example, contends that one item of damage caused by the alleged bad faith breach of the statute is the amount of attorney fees and costs which it incurred after the settlements were consummated with the settling defendants. Although there is no precise authority holding such fees and costs recoverable, we think there is no distinction in substance between those cases which permit recovery of attorney fees and costs where the breach of duty makes it necessary for a plaintiff to sue third persons (*Prentice* v. *North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618 [30 Cal.Rptr. 821, 381 P.2d 645]; *Vanguard Recording Society, Inc.* v. *Fantasy Records, Inc.* (1972) 24 Cal.App.3d 410, 419 [100 Cal.Rptr. 826]), and cases where, as here, it is alleged that the breach of duty made it necessary for a nonsettling defendant to continue to defend an action brought by third persons.

participate in negotiations and his reasonableness in insisting on trial may be relevant to the good faith of those who do settle. There may be justification for a seemingly disproportionate settlement which is not readily apparent and which can be explained by the peculiar factual or legal implications of the case. We merely conclude from the record before us that bad faith cannot be ruled out as a matter of law and that Southern Pacific should be permitted to file a separate action against plaintiffs and the settling defendants to determine the issue of good faith and the amount of damages in the event of a finding in favor of Southern Pacific on the issue of liability.

Subject to the above, the judgment in favor of the City of Sunnyvale and Southern Pacific in the wrongful death action, the judgment in favor of Mrs. Lareau in the amount of $125,000, and the dismissal of the declaratory relief action, are affirmed. Each party is to bear its own costs on appeal.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied February 20, 1975, and the petition of appellants Lareau for a hearing by the Supreme Court was denied April 24, 1975.