[Civ. No. 58497. Second Dist., Div. Four. Mar. 14, 1980.]

FRANK A. FISHER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
FRANK COLETTO FORD COMPANY et al.,
Real Parties in Interest.

[Civ. No. 58498. Second Dist., Div. Four. Mar. 14, 1980.]

NORMA JEAN SCHULTZ, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
FORD MOTOR COMPANY, Real Party in Interest.

**COUNSEL**

Cummins, White, Robinson & Robinson, Mark P. Robinson, Stockdale, Peckham, Estes, Lawler & Iorillo, James T. Catlow and Gordon G. Phillips for Petitioners.

No appearance for Respondent.

McCutchen, Black, Verleger & Shea, Max K. Jamison, Bill E. Schroeder and Jonathan M. Gordon for Real Parties in Interest.

OPINION

McCLOSKY, J.*—On February 7, 1980, at the request of plaintiff-petitioner Frank A. Fisher (hereafter Fisher) and cross-defendant-petitioner Norma Jean Schultz (hereafter Norma), this court issued an order staying the trial of this action until further order of the court and issued an alternative writ of mandate directing the respondent court to:

"(a) [V]acate the order of January 31, 1980, in Los Angeles Superior Court case No. SWC 29079, entitled Frank A. Fisher v. Norma Jean Schultz, Frank Coletto Ford Company, et al., denying petitioner's motion for trial of the issue of good faith settlement between the petitioner and the defendant and cross-defendant therein, Norma Jean Schultz, in advance of the trial of all other issues, and to make a new and different order granting that motion and proceed to try and determine the issue of good faith settlement prior to commencement of trial of any other issue, forthwith, or

"(b) in the alternative show cause... why a peremptory writ of mandate ordering you to do so should not issue."

On February 11, 1980, the respondent court vacated its prior order of January 31, 1980, pursuant to alternative (a) of the aforementioned writ of mandate and set the issue of good faith settlement for trial on February 26, 1980, and set the trial of the plaintiff Fisher's complaint for March 10, 1980. Thereafter we vacated that stay order.

The respondent court had denied the motion of petitioners Fisher and Norma for trial of the issue of good faith settlement between petitioners Fisher and Norma, in advance of the trial of all other issues. As the respondent court's ruling presents a question of first impression of general importance to the trial courts and to the legal profession, we issued the alternative writ. (See *West Hills Hospital* v. *Superior Court* (1979) 98 Cal.App.3d 656 [159 Cal.Rptr. 645, 646]; *Oceanside Union School*

---

*Assigned by the Chairperson of the Judicial Council.

*Dist.* v. *Superior Court* (1962) 58 Cal.2d 180 [23 Cal.Rptr. 375, 373 P.2d 439].)

Because these cases present issues of great importance to the legislatively and judicially declared policy of our state to encourage settlement of cases before trial, because of the need to discourage the proliferation of needless litigation, and for the further purpose of setting forth guidelines for future cases, we write this opinion to explain why we issued the alternative writ.

The uncontroverted facts recited in Schultz's and Fisher's petitions disclose that the underlying action arises out of an accident which occurred in 1973, when the Ford manufactured vehicle operated by petitioner-defendant Norma struck and seriously injured plaintiff Fisher by "pinning" him between the vehicle she was operating and a parked vehicle in a driveway. On or about May 22, 1974, Fisher filed a complaint alleging the negligent operation of the vehicle by defendant Norma, the defective and negligent design and manufacture of the vehicle by Ford Motor Company (hereafter Ford), and the negligent servicing by defendant Frank Coletto Ford Company (hereafter Dealer), all proximately causing the injuries and damages which Fisher claimed to have sustained. Answers were interposed by each of the defendants.

In December 1974, plaintiff Fisher settled all his claims against the defendants Norma and James Schultz for the sum of $100,000, which sum was the total amount of insurance policy limits available to the Schultz's to cover their liability to Fisher. This settlement was evidenced by a covenant not to execute and by a covenant not to sue further, and was disclosed to Ford and Dealer at or about the date of the settlement. Requests for dismissal as to Norma and James Schultz only, however, were not filed with the court until on or about January 23, 1980.

Eventually Norma and Ford cross-complained against each other, each alleging the fault of the other, and each asking for indemnity and for a declaration by the court that each was entitled to implied or (equitable) indemnity against the other. Although Ford had long been aware of the 1974 settlement between Norma and Fisher, Ford did not, in its cross-complaint or otherwise, refer to the settlement or allege that it had not been made in good faith. Norma, in her answer to Ford's cross-complaint, did raise as an affirmative defense that she had made a good faith settlement with Fisher (which, if true, would, under Code of Civil

Procedure, section 877, and *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899] (hereafter *AMA*), have the effect of discharging her from any and all liability to the other codefendants herein).

The case was called for trial on January 30, 1980. After advising the court of her settlement with plaintiff, Norma's attorney moved for a separate trial pursuant to Code of Civil Procedure section 597 on the issue of the good faith of her 1974 settlement with plaintiff Fisher, said trial to be held in advance of the trial on plaintiff's complaint against defendants and on the cross-complaints. Respondent court denied the motion for the separate trial of this issue in advance of the rest of the trial but on motion of defendants Ford and Dealer (pursuant to Code Civ. Proc., § 1048, subd. (b)) bifurcated the trial on the complaint from the trial on all the cross-complaints, ruling that the trial on the cross-complaints and the issue of good faith settlement would be held following the trial on plaintiff's complaint.

In connection with its ruling, the court indicated that Norma, although no longer a party defendant to the trial of the complaint (hereafter the main trial) would be allowed to participate in the main trial, through her attorney, in order to protect her interests since the court intended to have the jury in the main trial make special findings upon the degree of respective culpability, if any, of all of the persons, including Norma, who were involved in the events.

Both plaintiff Fisher and defendant Norma objected to these rulings and indicated rulings of the court as prejudicial and plaintiff further unsuccessfully objected to having Norma present participating in the main trial. Norma's attorney indicated that she probably would not participate in that trial. The court then indicated that it might have the same jury that tried the main action try the cross-complaints and might make the jury's special findings in the main trial on the (respective) proportionate fault of all of the persons binding on the trier of fact's determination of the cross-complaints. The court indicated that if Norma did not "participate" in the main trial, she might well be prejudiced by not having participated.

■ Petitioner points out that there are no existing procedural guidelines as to *when* the issue of the good faith of a settlement between plaintiff and one of several joint tortfeasors should be tried in relation to the trial of the tort issues. This court decides that the issue of the

good faith settlement between the plaintiff and the settling tortfeasor should be tried separately and in advance of the trial of the tort issues, and upon motion of any party to the action should be tried as soon after the settlement as the court's calendar permits.

Until *AMA* was decided by the Supreme Court, this state had only three cases that had considered the question of the good faith of one of the parties to a settlement agreement between plaintiffs and one or more of several joint tortfeasors. These were *River Garden Farms, Inc. v. Superior Court* (1972) 26 Cal.App.3d 986 [103 Cal.Rptr. 498] (hereafter *River Garden*); *Lareau v. Southern Pac. Transportation Co.* (1975) 44 Cal.App.3d 783 [118 Cal.Rptr. 837] (hereafter *Lareau*); and *Stambaugh v. Superior Court* (1976) 62 Cal.App.3d 231 [132 Cal. Rptr. 834] (hereafter *Stambaugh*).

*River Garden, supra,* at page 1003, teaches that: "Usually it will be helpful to determine the validity of the settlement before the tort action goes to trial. Only in the light of that determination will the parties be able to form their attitudes toward further settlement and shape their trial tactics. In most cases evidence of the circumstances of the settlement would clutter the tort trial with irrelevancies and possible prejudice. The trial court may hear and decide the defendant's claim as a separate defense under Code of Civil Procedure section 597 or order a separate trial of the good faith issue under section 1048." The reasoning applies as well to the case at bench. The *Lareau* court was faced with two settlements made during the trial of the tort action so that *River Garden*'s recommendation of a determination of the good faith of the settlement in advance of the trial of plaintiff's tort action against the remaining tortfeasors was not possible in that case.

*Stambaugh, supra,* 62 Cal.App.3d 231, involved a petition for a writ of mandate to compel the superior court to grant a settling defendant's motion for summary judgment or for judgment on the pleadings as to the cross-complaint for indemnity and for contribution by an alleged concurrent tortfeasor against it.

The *Stambaugh* court held that the superior court had erred in denying the settling cotortfeasor's motion for summary judgment or judgment on the pleadings and issued the writ. Therefore, the question of when, if ever, with relation to the trial on the main tort issues, the issue of the good faith settlement was to be tried, did not arise.

Ever since *AMA* was decided by the California Supreme Court, the superior courts of our state have been deluged with cross-complaints for comparative (equitable) indemnity between alleged joint tortfeasors. *AMA, supra,* 20 Cal.3d at page 608, announced that "under the common law equitable indemnity doctrine a concurrent tortfeasor may obtain partial indemnity from cotortfeasors on a comparative fault basis." Some of these cross-complaints have been filed against cotortfeasors who have already made good faith settlements with the plaintiffs involved.

This was never the intent of the *AMA* court. After stating the general rule that "under the governing statutory provisions a defendant is generally authorized to file a cross-complaint against a concurrent tortfeasor for partial indemnity on a comparative fault basis, even when such concurrent tortfeasor has not been named as a defendant in the original complaint" (*AMA, supra,* 20 Cal.3d at p. 607), the *AMA* court recognized in footnote 9 on the same page that: "There are, of course, a number of significant exceptions to this general rule. For example, when an employee is injured in the scope of his employment, Labor Code section 3864 would normally preclude a third party tortfeasor from obtaining indemnification from the employer, even if the employer's negligence was a concurrent cause of the injury. [Citations.]

"Similarly, as we have noted above *such a partial indemnification claim cannot properly be brought against a concurrent tortfeasor who has entered a good faith settlement with the plaintiff,* because permitting such a cross-complaint would obviously undermine the explicit statutory policy to encourage settlements reflected by the provisions of section 877 of the Code of Civil Procedure. (See pp. 603-604, *ante.*)" (Italics added.)

The encouragement of settlements has always been part of the strong public policy of our state. *Stambaugh, supra,* 62 Cal.App.3d at pages 235-236, summarized that policy in the following language: "Section 877 provides:

"'Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—(a)...(b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors.'

"Section 877's intent is clear. Where an alleged joint tortfeasor, prior to a judicial determination of his liability, in good faith settles the claim against him, he is forever discharged of further obligation to the claimant, and to his joint tortfeasors, by way of contribution or otherwise. [Citations.]

"At least debatably, the release of a joint tortfeasor according to section 877 might . . . place a disproportionate burden upon the nonsettling joint tortfeasors contrary to the rationale of the state's contribution statutes. (See generally Code Civ. Proc., §§ 875-880.) But section 877 gives expression to another strong policy of our law, the policy that settlement of litigation should be encouraged.

""""The law wisely favors settlements . . . ."" (*Potter v. Pacific Coast Lumber Co.*, 37 Cal.2d 592, 602 [234 P.2d 16]; and see *People* ex rel. *Dept. Pub. Wks.* v. *Douglas*, 15 Cal.App.3d 814, 820 [93 Cal.Rptr. 644]; *Brown* v. *Guarantee Ins. Co.*, 155 Cal.App.2d 679, 696 [319 P.2d 69]; *Cilibrasi* v. *Reiter*, 103 Cal.App.2d 397, 400 [229 P.2d 394]; *Lamb* v. *Herndon*, 97 Cal.App. 193, 203 [275 P. 503].) '[I]t is the policy of the law to discourage litigation and to favor compromises of doubtful rights and controversies, made either in or out of court.' (*Hamilton* v. *Oakland School Dist.*, 219 Cal. 322, 329 [26 P.2d 296]; see also *Central Basin etc. Wat. Dist.* v. *Fossette*, 235 Cal.App.2d 689, 705 [45 Cal.Rptr. 651].) Settlement agreements '"are highly favored as productive of peace and goodwill in the community, and reducing the expense and persistency of litigation."' (*McClure* v. *McClure*, 100 Cal. 339, 343 [34 P. 822]; see also *Estate of Johanson*, 62 Cal.App.2d 41, 56 [144 P.2d 72].) Indeed, it has been said that a major goal of section 877 is the 'encouragement of settlements.' (*Insurance Co. of North America* v. *United States Fire Ins. Co.*, 34 Cal.App.3d 391, 396 [110 Cal.Rptr. 48]; *River Garden Farms, Inc.* v. *Superior Court*, 26 Cal. App.3d 986, 993 [103 Cal.Rptr. 498].)"

In enunciating the comparative or partial equitable indemnity doctrine, the *AMA* court also extended the section 877 doctrine to discharge any tortfeasor who enters into a "good faith" settlement with the plaintiff from any claim for partial or comparative indemnity that may be pressed by a concurrent tortfeasor.

"Although section 877 reflects a strong public policy in favor of settlement, this statutory policy does not in any way conflict with the recognition of a common law partial indemnity doctrine but rather can,

and should, be preserved as an integral part of the partial indemnity doctrine that we adopt today. Thus, while we recognize that section 877, by its terms, releases a settling tortfeasor only from liability for contribution and not partial indemnity, we conclude that from a realistic perspective the legislative policy underlying the provision dictates that a tortfeasor who has entered into a 'good faith' settlement (see *River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d 986) with the plaintiff must also be discharged from any claim for partial or comparative indemnity that may be pressed by a concurrent tortfeasor. As the Court of Appeal noted recently in *Stambaugh v. Superior Court* (1976) 62 Cal.App.3d 231, 236 [132 Cal.Rptr. 843]: 'Few things would be better calculated to frustrate [section 877's] policy, and to discourage settlement of disputed tort claims, than knowledge that such a settlement lacked finality and would lead to further litigation with one's joint tortfeasors, and perhaps further liability.' This observation is as applicable in a partial indemnity framework as in the contribution context. Moreover, to preserve the incentive to settle which section 877 provides to injured plaintiffs, we conclude that a plaintiff's recovery from nonsettling tortfeasors should be diminished only by the amount that the plaintiff has actually recovered in a good faith settlement, rather than by an amount measured by the settling tortfeasor's proportionate responsibility for the injury. [Citation.]" (*AMA, supra,* 20 Cal.3d at pp. 603-604.)

A defendant who, in good faith, settles plaintiff's case against him is certainly entitled to the benefit of that bargain and is entitled to be free of the expenses of the trial and the hazards of further litigation.

The best way to encourage settlements of cases involving alleged concurrent tortfeasors where one of them wishes to settle with plaintiff and the "good faith" of that settlement is, or may be, questioned, is to make a judicial determination of the merits of the good faith of the parties involved at the earliest possible time. *River Garden, supra,* 26 Cal.App.3d at page 998, explains: "Good or bad faith is a question of fact in each case (*Critz v. Farmers Ins. Group, supra,* 230 Cal.App.2d 788 at p. 796 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142].) Only a trial court may reach a decision, guided by the evidentiary material presented to it," subject, of course, as *Stambaugh* points out, to appropriate motions for summary judgment and for judgment on the pleadings.

If the parties are entitled to a trial on the issue of the "good faith" of a settlement entered into between the plaintiff in the action with one or

more of the alleged cotortfeasors, then to give meaning to the questioned settlement, the trial of that issue must be held in advance of the trial of the plaintiff's complaint or of any determination of comparative or partial (equitable) indemnity as between cross-complainant and cross-defendant tortfeasors.

If the rule were otherwise, then the settling tortfeasor would be deprived of the benefit of his bargain with the plaintiff. He would suffer all the expense and inconvenience of a multiparty trial and could still possibly be held liable for more than he settled for through the back door of a cross-complaint for comparative indemnity against him. Obviously that would destroy every incentive for settlement and would result in the needless proliferation of a great number of more complex trials.

This case presents an excellent example of the point. If the allegations in Fisher's and Norma's petitions are correct, then Norma and James Schultz's insurance company settled plaintiff Fisher's serious injury case against them for its full policy limit of $100,000 in 1974, fully expecting that it had bought its peace and was out of the suit as far as being a party defendant or cross-defendant exposed to any liability. Now Norma and her insurance company are faced with the time and expense of an estimated 35- to 45-day trial, with the possibility of a judgment against Norma in favor of Ford for a sum in excess of her $100,000 policy limit. If Norma sustains her burden of proof on the issue of good faith, then Ford's claim for indemnity against her dies and she and her insurance company are quit of the case. It would be an unfair burden on Norma and her insurance company to make her (or her insurance carrier) pay for and go through the defense of a long trial on the tort issues if it is determined that she settled with plaintiff in good faith.

On the other hand, if it is determined by the trier of fact that she did not settle in good faith, very little, if any, trial time is lost, because the issues involved in the determination of the "good faith" of the challenged settlement are, with one exception, very different from the issues involved in the trial of the tort case as between plaintiff and the nonsettling alleged joint tortfeasors and between the alleged joint tortfeasors themselves. That one exception involves the question of liability for the happening of the accident or underlying tort.

On that one issue of liability there is no substantial savings of time to the parties or the courts in trying the issues together because the only

thing *relevant* to making a determination of the good faith of the settlor regarding the liability of the tortfeasors to the plaintiff is what was, or should have been, known to the settlor *at the time the questioned settlement is made.* What is brought out about the underlying liability picture during subsequent discovery or trial after that settlement is not relevant to the "good faith" settlement issue because it could not have been a matter affecting the "good faith" of the settlor *at the time of the settlement.*

Further, to mix the trial of the tort issues with the good faith issue would in most cases necessitate the introduction of evidence of the settlor's insurance policy limits, the wealth of the settling defendant, and other evidence which is inadmissible on the issue of liability, to the probable prejudice of the settling defendant, thus adding confusion and undue prejudice against the settlors.

Having thought that he had bought his peace by the settlement, the settling tortfeasor acting in good faith may not have participated in years of discovery that took place after he settled and before trial (even as petitioner Schultz alleges is the situation in the case at bench), and he understandably will not have expended the necessary defense costs to prepare a viable defense of the main trial issues. Otherwise he would not have settled.

The issue of the "good faith" of settlements as between defendants has been blown out of proportion and has needlessly wasted a great deal of legal and judicial time and expense.

In the 22 years since the effective date of the contribution statutes (i.e., Code Civ. Proc., §§ 875-880), there is no reported California case that has actually held that a settling plaintiff or tortfeasor has not acted in good faith to the nonsettling alleged joint tortfeasors in making settlement. The nearest the courts have come to doing so is in *River Garden* and *Lareau*, each of which appeared to involve grossly improper inequitable allocations of settlement proceeds, which allocation in each case appeared to be specifically designed to injure the interest of the nonsettling remaining defendant. In neither of these cases was the *total amount of the settlement* questioned by the reviewing court. In both *River Garden* and *Lareau* the courts indicated that the parties were entitled to try the facts to prove or disprove the good faith of the settlement (*River Garden, supra,* 26 Cal.App.3d at p. 998), and indicated some of the factors to be taken into consideration in determining

the good faith of the settlors (see *River Garden, supra*, 26 Cal.App.3d at p. 998, and *Lareau, supra*, 44 Cal.App.3d at pp. 795-796).

"In viewing the good faith provision of section 877 as an aid to equitable sharing, one must not overlook the statutory objective of encouraging settlements and assuring them a measure of finality. A potential defendant's desire for settlement is blunted when he cannot close his file on the case. (See Commissioners' Note, 9 Uniform Laws Annot. (1967 pocket part) pp. 132-133; 18 Stan.L.Rev. at pp. 488-489; 9 Hastings L.J. at pp. 187-188.) The goals of equitable sharing and settlement finality compete with each other. If the good faith clause demands equitable sharing as fixed by a jury verdict which has not yet taken place, the parties cannot negotiate safely, cannot accomplish settlement with a fair assurance of finality. All involved in the personal injury settlement business are aware of its large imponderables—the risk of victory or defeat at the jury's hands, the risk of a high or low verdict, the unknown strengths and weaknesses of defenses, the inexact appraisal of damage elements, the defendant's solvency and the extent of insurance coverage. In advance of a jury verdict, most cases permit only a rough assessment of value. When one tortfeasor chooses to settle and another chooses to litigate, inequality in the ultimate cost does not signalize bad faith. (See *Wheeler* v. *Denton*, 9 N.C.App. 167 [175 S.E. 2d 769, 771-772].)" (*River Garden*, 26 Cal.App.3d at p. 997.)

"The price of a settlement is [said to be] the prime badge of its good or bad faith." (See *River Garden, supra*, at p. 996.) But that price is not considered in a vacuum. When the insurance company for a settling defendant pays its total available policy limits, that is very strong evidence of a "good faith" settlement, absent evidence of collusion or grossly inappropriate allocation or apportionment of the settlement proceeds to injure the nonsettling alleged tortfeasors. It would be extremely difficult to envision a set of circumstances in which an insurance company would pay out its entire substantial policy limit (as was apparently done in the case at bench) simply to injure another codefendant. Experience teaches us that insurance companies usually and ordinarily pay their policy limits only to have their insureds and themselves discharged from all liability in any given case.

*Stambaugh, supra*, 62 Cal.App.3d at pages 238-239, states the proposition well: "We have heretofore pointed out the policy of the law favoring settlement of litigation. Except in rare cases of collusion or bad

faith, such as were claimed in *River Garden Farms, Inc.* v. *Superior Court, supra*, 26 Cal.App.3d 986, and *Lareau* v. *Southern Pac. Transportation Co., supra*, 44 Cal.App.3d 783, a joint tortfeasor should be permitted to negotiate settlement of an adverse claim according to his own best interests, whether for his financial advantage, or for the purchase of peace and quiet, or otherwise. His good faith will not be determined by the proportion his settlement bears to the damages of the claimant. For the damages are often speculative, and the probability of legal liability therefor is often uncertain or remote. And even where the claimant's damages are obviously great, and the liability therefor certain, a disproportionately low settlement figure is often reasonable in the case of a relatively insolvent, and uninsured, or underinsured, joint tortfeasor. . . .

"But we opine that it would be a rare case indeed, where, as here, a joint tortfeasor who was the immediate causative agent of a claimant's injuries, who settles for the full amount of his insurance coverage, may reasonably be charged with lack of good faith under section 877. And it must be noted that in such a case all joint tortfeasors against whom a judgment is finally entered will be the beneficiaries of such a settlement, for its amount will be deducted from the claimant's damages as found by the trier of fact. (See Code Civ. Proc., § 877, subd. (a); *Winzler & Kelly* v. *Superior Court*, 48 Cal.App.3d 385, 392 [122 Cal. Rptr. 259].)"

As *Lareau, supra*, 44 Cal.App.3d 783, 795, citing page 997 of *River Garden*, says: "*The goals of equitable sharing and settlement finality compete with each other.*" (Italics in original.)

*River Garden, supra*, 26 Cal.App.3d at page 998, held that, with regard to the goals of encouraging settlements on the one hand and equitable financial sharing on the other hand, "Neither statutory goal should be applied to defeat the other," but *River Garden* assigned no priority as to those two goals. *Sears, Roebuck & Co.* v. *International Harvester Co.* (1978) 82 Cal.App.3d 492 [147 Cal.Rptr. 262] (hereafter *Sears*), and *American Bankers Ins. Co.* v. *Avco-Lycoming Division* (1979) 97 Cal.App.3d 732 [159 Cal.Rptr. 70] (hereafter *American Bankers*) did.

*Sears, supra*, at page 496, correctly analyzed *AMA* as creating a hierachy of interests as between these competing goals and one other, as

follows: "We analyze the Supreme Court decisions as creating a hierarchy of interests. First in the hierarchy is maximization of recovery to the injured party for the amount of his injury to the extent fault of others has contributed to it. (See *Li* v. *Yellow Cab Co., supra*, 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], eliminating the bar to recovery of contributory negligence, and *American Motorcycle Assn.* v. *Superior Court, supra*, 20 Cal.3d 578, retaining the rule of joint liability of concurrent tortfeasors and holding named defendants liable for damage assessable against unnamed persons.) Second is encouragement of settlement of the injured party's claim. (*American Motorcycle Assn.* v. *Superior Court, supra*, 20 Cal.3d at pp. 603-604.) Third is the equitable apportionment of liability among the tortfeasors. (*Id.*, 20 Cal.3d at pp. 603-605.)" (Accord *American Bankers, supra*, 97 Cal.App.3d at p. 736.) *American Bankers*, in dealing with the subject, states the rule: "The relevant public policy considerations underlying multiparty tort litigation in decreasing order of priority are: (1) the maximization of recovery to the injured party, (2) settlement of the injured party's claim, and (3) equitable apportionment of liability among concurrent tortfeasors. . . .

"Every effort should be made to encourage the amicable and fair resolution of disputes. When needless and time-consuming litigation can be avoided, costs for all parties are reduced."

As we have been petitioned to ". . . Declare as error the selection of a procedural device which would contravene the public policy encouraging pretrial settlements and would, if permitted to proliferate amongst the trial courts, have a tendency to discourage and even prevent pretrial settlement where more than one tortfeasor is involved as a party to an action," we consider next the question of the burden of proof at the trial on the merits of the "good faith" settlement issue.

Upon the trial of the "good faith" settlement issue, the burden of proving that there has been a settlement is on the settlor who asserts that settlement as a bar to all claims for contribution or comparative (equitable) indemnity by any other tortfeasor. Proving the settlement is not ordinarily a problem. Once there is a showing made by the settlor of a settlement, we are of the opinion that the burden of proof on the issue of "good faith" shifts to the nonsettling tortfeasor who asserts the claim that the settlement was not made in good faith.

Evidence Code section 500 provides that, *"Except as otherwise provided by law,* a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Italics added.)

As is stated in the Law Revision Commission comment to Evidence Code section 500: "The general rule allocating the burden of proof applies 'except as otherwise provided by law.' The exception is included in recognition of the fact that the burden of proof is sometimes allocated in a manner that is at variance with the general rule. In determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, *the most desirable result in terms of public policy* [italics added] in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact. In determining the incidence of the burden of proof, 'the truth is that there is not and cannot be any one general solvent for all cases. It is merely a question of policy and fairness based on experience in the different situations.' 9 Wigmore, Evidence § 2486 at 275 (3d ed 1940). . . . Despite the statutory definition, subdivisions 1 and 4 of the Code of Civil Procedure Section 1963 (superseded by Sections 520 and 521 of the Evidence Code) provide presumptions that a person is innocent of crime or wrong and that a person exercises ordinary care for his own concerns. . . . It is apparent that these so-called presumptions do not arise from the establishment or proof of a fact in the action. In fact, they are not presumptions at all but are preliminary allocations of the burden of proof in regard to the particular issue."

Evidence Code section 520 provides: "The party claiming that a person is guilty of crime or wrongdoing has the burden of proof on that issue."

Deering's California annotated Evidence Code section 520, Case Law Assessor's Evaluation of Decisions Under Prior Law, states the applicability of prior cases to Evidence Code section 520 as follows: "Since the so-called presumption of subd 1 of former CCP § 1963 was not a presumption at all but, rather, was a preliminary allocation of the burden of proof in regard to that particular issue, notes of decisions from cases construing that former subdivision is set out hereunder as of possible persuasive or authoritative value in construing and applying Ev C § 520.

" . . . . . . . . . . . . . .

"The presumption of good faith attends upon every act, unless the surrounding circumstances are such as to overcome the presumption. *Klemmer* v. *Klemmer* (1919) 42 C.A. 618, 187 P. 85."

"The most desirable result in terms of public policy in the absence of the proof of the particular fact" (see Law Revision Com. com. to Evid. Code, § 500) is certainly to encourage settlement and discourage needless litigation. That public policy, coupled with the next consideration in the aforementioned Law Revision Commission comment to Evidence Code section 500, i.e., "the probability of the existence or nonexistence of the fact," necessitates the result we reach today putting the burden of proof on the nonsettling tortfeasor who challenges the "good faith" aspect of the settlement. In light of human experience that insurance companies and tortfeasors most rarely, if ever, pay substantial sums of money in settlement of tort cases for any purposes other than to extricate their insureds and themselves from continuing defense costs and exposure to possible liability after trial for the payment of greater sums in damages than the sum which they agree to pay by way of settlement.

We, accordingly, hold that, once there has been a showing that a settlement has been made, the burden of proof on the issue of the "good faith" of the settlor shifts to the party who claims that the settlement was not made in good faith.

The trial court having complied with alternative (a) of our writ, the matter is now moot. The proceedings are dismissed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied April 10, 1980, and on March 31, 1980, the opinion was modified to read as printed above.