[Civ. No. 67413. Second Dist., Div. Two. Oct. 11, 1983.]

FORD MOTOR COMPANY, Cross-complainant and Appellant, v. NORMA JEAN SCHULTZ, Cross-defendant and Appellant.

942

**COUNSEL**

McCutchen, Black, Verleger & Shea, Bill E. Schroeder and Jonathan M. Gordon for Cross-complainant and Appellant.

Stockdale, Peckham, Estes & Werner, James T. Catlow and Paul F. Swoa for Cross-defendant and Appellant.

**OPINION**

**ROTH, P. J.**—The matter before us arises out of a June 1973 motor vehicle accident in which Frank Fisher (Fisher) was injured when a car manufactured by Ford Motor Company (Ford) and operated by Norma Jean Schultz (Norma) was backed down the driveway of Norma's home in such fashion as to pin Fisher's leg between the car and another vehicle parked in the driveway. Fisher's subsequent suit for damages brought in May of 1974 against Norma, her husband James Schultz, Ford and Frank Coletto Ford (Coletto), a servicing dealership, in due course generated cross-complaints among the defendants for indemnity.

■■■■ As the case progressed, it was determined by Division Four of this court through writ proceedings that the special defense raised

by Norma against indemnity by virtue of her claimed December 1974 set-tlement with Fisher should be tested prior to trial of all other issues (see Code Civ. Proc., §§ 877, 877.6; *Fisher v. Superior Court* (1980) 103 Cal.App.3d 434, 438-439 [167 Cal.Rptr. 47]).[1] Pursuant to that determination and on February 11, 1981, an order was entered granting Norma's motion for summary judgment on the question, which relieved her from any further liability associated with the cross-complaints.

When the principal case as between Fisher and Ford and Coletto was thereafter settled, a final judgment based upon the prior summary judgment order was entered, dismissing Ford's cross-complaint against Norma. Ford appeals from that final judgment, asserting the summary judgment was improperly granted.

Ford's contention in this regard is dual, the claim being there were material triable issues of fact both as to whether there was a settlement and, if so, whether that settlement was made in good faith. (See fn. 1.) In order to

---

[1]The statutes cited provide respectively that:

"Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort -

"(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and

"(b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors." (Code Civ. Proc., § 877.)

"(a) Any party to an action wherein it is alleged that two or more parties are joint tortfeasors shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors, . . .

"(b) The issue of the good faith of a settlement may be determined by the court on the basis of affidavits served with the notice of hearing, and any counter-affidavits filed in response thereto, or the court may, in its discretion, receive other evidence at the hearing.

"(c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.

"(d) The party asserting the lack of good faith shall have the burden of proof on that issue. (Code Civ. Proc., § 877.6.) The appropriate methodology to be employed in this connection was described in *Fisher* as requiring that:

"Upon the trial of the 'good faith' settlement issue, the burden of proving that there has been a settlement is on the settlor who asserts that settlement as a bar to all claims for contribution or comparative (equitable) indemnity by any other tortfeasor. Proving the settlement is not ordinarily a problem. Once there is a showing made by the settlor of a settlement, we are of the opinion that the burden of proof on the issue of 'good faith' shifts to the nonsettling tortfeasor who asserts the claim that the settlement was not made in good faith." (*Fisher v. Superior Court, supra*, 103 Cal.App.3d 434, 447.)

The reference in the statement to "the trial" was expressly recognized as including "appropriate motions for summary judgment and for judgment on the pleadings." (*Id.*, at p. 442.)

clarify the context in which these claims are made, we set out the following further facts attending the purported settlement between Norma and Fisher.

At the time of the accident, Norma was insured with respect to her automobile by California Casualty Indemnity Exchange (California Casualty), with applicable policy limits of $100,000. She also was insured to the extent of $25,000 on a homeowner's policy issued by Unigard, which arguably was available for purposes of the action.

On October 19, 1973, Norma was divorced from James Schultz. Beginning in July of 1975, she lived with Fisher, and in January of 1977, the two were married. She was dismissed from the action by Fisher in January of 1980.

The claimed settlement involved only California Casualty and was effected by its policy limit payment to Fisher of $100,000. That payment was evidenced by two instruments entitled respectively "Covenant Not to Execute On Possible Judgment In Pending Suit" and "Covenant Not To Sue Further." The first of these provided in part that:

"THIS AGREEMENT made and entered into this 23rd day of December, 1974, by and between FRANK A. FISHER, First Party, NORMA JEAN SCHULTZ and JAMES SCHULTZ, Second Party, and CALIFORNIA CASUALTY INDEMNITY EXCHANGE, a Corporation, Third Party.

". . . . . . . . . . . . . . . . . . . .

"1. That for and in consideration of the premises and payment to the First Party of the sum of $100,000 by the Third Party on behalf of Second Party, the receipt of which is hereby acknowledged, the First Party hereby covenants and agrees that he will not at any time, nor shall any one for him or on his behalf levy or sue out an execution or executions against the Second Party or Third Party on any judgment rendered in the above cause; provided, however, that nothing in this agreement shall restrict, impair or prevent First Party from pursuing, levying or executing against any liability policy which might be deemed 'excess coverage' from any other insurance carrier other than Party of the Third Part.

"2. Except as hereinabove provided, First Party further covenants and agrees that he will indemnify and hold harmless Second Party and Third Party against any and all such executions, against any and all contributions by reason of such judgment, and against any and all liability for indemnity by reason of such judgment.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The second provided, similarly, that: "IN CONSIDERATION of the payment to me, FRANK A. FISHER, of the sum of ONE HUNDRED THOUSAND DOLLAR ($100,000.00), of which the sum of TWENTY THOUSAND DOLLARS ($20,000.00) has been heretofore received and acknowledged, I hereby covenant and agree with NORMA JEAN SCHULTZ and JAMES SCHULTZ,. their heirs, executors or administrators, that I will not further prosecute against them, that certain action presently pending in the Superior Court of the State of California, in and for the County of Los Angeles, bearing file number SW C 29079, said action having grown out an accident which occurred on or about June 13, 1973, at or near Portuguese Bend, California, . . .

"IT IS FURTHER understood and agreed, and it is the express intent of this agreement that this agreement shall not interfere or limit in any way FRANK A. FISHER's right or ability to prosecute his above-mentioned suit to determine if excess insurance coverage is available to further compensate him for his injuries and damages and in the event such coverage is found to exist and applicable to his cause of action, he shall have the right to pursue and prosecute his claims and causes of action to the limits of such 'excess coverage' through, if necessary, trial, judgment and execution thereon."

At the time of her marital dissolution, Norma had personal assets which, including her interest in her home, were valued at about $50,000.[2]

Ford's settlement with Fisher was for the sum of $310,000. Norma's attorney estimated the value of Fisher's suit at about $500,000 and acknowledged speculatively its worth might approach twice that amount.

At the time of the purported settlement, the question whether Fisher was or was not contributorily negligent remained an open one, but Norma's attorney and California Casualty's representative believed that Ford's liability was highly doubtful.

In support of its contention summary judgment should not have been granted, Ford first maintains Norma's moving papers to that end failed to supply a requisite showing, without even taking into consideration what was proferred in opposition. More specifically, what is suggested is, first, that

---

[2]It is alluded to by Ford that Norma's financial declaration submitted in the dissolution proceedings showed an interest in $110,000 of life insurance cash value. While the fact of such an asset would not alter our disposition herein, we surmise in passing that its existence would be questionable, based on the couples' income, after other expenses, of some $600 per month and the fact it was not claimed by Norma to be subject to disposition in those proceedings.

the documentation quoted above shows on its face a lack of intention to effect a "settlement," in that Fisher was left free to pursue his case vis-à-vis any additional insurance Norma might have, and, second, that Norma did not negative those considerations which might have evidenced the *bad faith* character of the transaction.

■ Placing aside for a moment the first of these points, it is clear to us the second is without merit, in that, as has been shown, once the settlement is satisfactorily established, so is the element of good faith, unless (on a motion for summary judgment) the contrary is adequately placed in issue by the party opposing the motion. (See fn. 1.) Accordingly, if it is concluded, the documentation described legally constitutes a settlement, Norma's moving papers were, in the first instance, and without reference to Ford's opposition, adequate to their purpose.

We have no difficulty in reaching that conclusion. As we see it, what the covenants entered into demonstrate is that in consideration of the payment of $100,000 to Fisher by Norma's insurer, California Casualty, Norma was exonerated from any further liability respecting the accident of which she was the primary causative agent. Put more simply, she was, based on the transaction, *out of the case.* And this is true regardless of whether Fisher retained an option to pursue additional insurance or whether California Casualty continued to incur expense by nominally remaining a participant in the suit, since the cost or value associated with either possibility constitutes nothing more than an additional component of the agreed upon consideration for the settlement.

■ Having so decided, it remains for us to inquire whether Ford is correct in contending that, in any event, the trial court erred in deciding as a matter of law the settlement was made in good faith.

On this issue Ford relies in terms of a theoretical foundation upon those principles enunciated in *River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986 [103 Cal.Rptr. 498] to the following effect: "Inferentially, the California demand for release in good faith was designed . . . to establish a standard of equitable conduct embracing other defendants as well as the immediate parties to the settlement.

". . . . . . . . . . . . . . . . . . . . . . . .

"[T]he National Conference of Commissioners on Uniform State Laws had revised an earlier version of a proposed Uniform Contribution Among Tortfeasors Act.

"The Uniform Law Commissioners accompanied their 1955 revision with a statement declaring that the good faith clause 'gives the court occasion to determine whether the transaction was collusive, and if so there is no discharge'; . . .

". . . . . . . . . . . . . . . . . . . . . . . . . .

"The notion of collusion advanced by the Uniform Law Commissioners implies something more than mere confederacy. Any negotiated settlement involves cooperation, but not necessarily collusion. It becomes collusive when it is aimed to injure the interests of an absent tortfeasor. Although many kinds of collusive injury are possible, the most obvious and frequent is that created by an unreasonably cheap settlement. . . .

"Construed in the light of the legislation's objectives, the good faith release clause extends the obligation of good faith beyond the parties to the negotiations, embracing an absent tortfeasor.

". . . . . . . . . . . . . . . . . . . . . . . . .

"Although the Uniform Law Commissioners pointed to collusion as the prime motivator of the good faith clause, the language of the clause is far broader. Lack of good faith encompasses many kinds of behavior. It may characterize one or both sides to a settlement. When profit is involved, the ingenuity of man spawns limitless varieties of unfairness. Thus, formulation of a precise definition of good faith is neither possible nor practicable. The Legislature has here incorporated by reference the general equitable principle of contribution law which frowns on unfair settlements, including those which are so poorly related to the value of the case as to impose a potentially disproportionate cost on the defendant ultimately selected for suit.

". . . . . . . . . . . . . . . . . . . . . . . .

"In viewing the good faith provision of section 877 as an aid to equitable sharing, one must not overlook the statutory objective of encouraging settlements and assuring them a measure of finality. A potential defendant's desire for settlement is blunted when he cannot close his file on the case. (See Commissioners' Note 9 Uniform Laws Annot. (1967 pocket part) pp. 132-133; 18 Stan.L.Rev. at pp. 488-489; 9 Hastings L.J. at pp. 187-188.) The goals of equitable sharing and settlement finality compete with each other. If the good faith clause demands equitable sharing as fixed by a jury verdict which has not yet taken place, the parties cannot negotiate safely, cannot accomplish settlement with a fair assurance of finality. All

involved in the personal injury settlement business are aware of its large imponderables—the risk of victory or defeat at the jury's hands, the risk of a high or low verdict, the unknown strengths and weaknesses of defenses, the inexact appraisal of damage elements, the defendant's solvency and the extent of insurance coverage. In advance of a jury verdict, most cases permit only a rough assessment of value. When one tortfeasor chooses to settle and another chooses to litigate, inequality in the ultimate cost does not signalize bad faith. (See *Wheeler* v. *Denton*, 9 N.C.App. 167 [175 S.E.2d 769, 771-772].)

"On the other hand, if the policy of encouraging settlements is permitted to overwhelm equitable financial sharing, the possibilities of unfair tactics are multiplied. Neither statutory goal should be applied to defeat the other. If the statute is to work well, the demand for good faith settlement should find its role as an accommodating factor between undesirable extremes.

". . . . . . . . . . . . . . . . . . . . . . .

"Good or bad faith is a question of fact in each case. (*Critz* v. *Farmers Ins. Group, supra,* 230 Cal.App.2d 788, at p. 796 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142].)" (*Id.,* at 995-998; see also *Lareau* v. *Southern Pac. Transportation Co.* (1975) 44 Cal.App.3d 783 [118 Cal.Rptr. 837].)

Premised upon this articulation of basic considerations relevant to the question of good faith settlement, Ford asserted below that the circumstances surrounding Norma's agreement as hereinabove described were sufficient to preclude adjudication by way of summary judgment. The trial court, on the other hand, was of the view the fact alone that California Casualty had paid its policy limits to Fisher rendered the settlement one made in good faith.[3]

We have no doubt that in placing its determination on so narrow a ground the trial court was in error.[4] At the same time we are of the opinion the conclusion it arrived at was correct.

---

[3]So, the trial court stated that:"Here's where I disagree with you. I think any time an insurer, regardless of what the policy limits are, and what the value of the assets of a co-defendant over and above the insurance policy, any time that insurance carrier offers its policy, that that, as a matter of law is a good faith settlement.

". . . . . . . . . . . . . . . . . . . . . . .

"I, again, go back to what I stated earlier: I think where you have the insurer in this particular situation being the automobile liability insurer pay its policy limits of $100,000, I think it's a matter of law it has to be a good faith settlement."

[4]A rule so formulated is without support from any authority of which we are aware. At most it has been said that: "When the insurance company for a settling defendant pays its total available policy limits, that is very strong evidence of a 'good faith' settlement, absent evidence of collusion or grossly inappropriate allocation or apportionment of the settlement

■ As was clearly observed in *Fisher* the decision in *River Garden,* quite apart from depending upon its own unique facts, preceded the decisions in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], *American Bankers Ins. Co.* v. *Avco-Lycoming Division* (1979) 97 Cal.App.3d 732 [159 Cal.Rptr. 70] and *Sears, Roebuck & Co.* v. *International Harvester Co.* (1978) 82 Cal.App.3d 492 [147 Cal.Rptr. 262], which made clear the existence of a hierarchy of interests, expressed in the rule that: "The relevant public policy considerations underlying multiparty tort litigation in decreasing order of priority are: (1) the maximization of recovery to the injured party, (2) settlement of the injured party's claim, and (3) equitable apportionment of liability among concurrent tortfeasors. . . ." (*American Bankers Ins. Co.* v. *Avco-Lycoming Division, supra,* 97 Cal.App.3d 732, 736.)

This hierarchy, in turn, was further pointed out in *Fisher* to be such that: " 'Except in rare cases of collusion or bad faith, such as were claimed in *River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d 986, and *Lareau* v. *Southern Pac. Transportation Co., supra,* 44 Cal.App.3d 783, a joint tortfeasor should be permitted to negotiate settlement of an adverse claim according to his own best interests, whether for his financial advantage, or for the purchase of peace and quiet, or otherwise.' " (*Fisher* v. *Superior Court, supra,* 103 Cal.App.3d 434, 445-446, quoting from *Stambaugh* v. *Superior Court, supra,* 62 Cal.App.3d 231, 238-239.)

■ Accordingly, we think what was reiterated in Fisher was that the rationale to be applied in any instance where the good faith character of a settlement is challenged is one which will find the existence of that element, absent any adequate showing of collusion "aimed at injuring the interests of an absent tortfeasor." (*River Garden Farms, Inc.* v. *Superior Court, supra,* 26 Cal.App.3d 986, 996.) Nothing in Ford's opposition to the motion for summary judgment sufficiently raised any triable issue of fact in terms of this rationale.[5]

---

proceeds to injure the nonsettling alleged tortfeasors. It would be extremely difficult to envision a set of circumstances in which an insurance company would pay out its entire substantial policy limit (as was apparently done in the case at bench) simply to injure another codefendant. Experience teaches us that insurance companies usually and ordinarily pay their policy limits only to have their insureds and themselves discharged from all liability in any given case." (*Fisher* v. *Superior Court, supra,* 103 Cal.App.3d 434, 445), and that: "[W]e opine that it would be a rare case indeed, where, as here, a joint tortfeasor who was the immediate causative agent of a claimant's injuries, who settles for the full amount of his insurance coverage, may reasonably be charged with lack of good faith under section 877." (*Stambaugh* v. *Superior Court* (1976) 62 Cal.App.3d 231, 239 [132 Cal.Rptr. 843].)

[5]Ford additionally *maintains* the summary judgment was improperly granted based on the limitation found in Code of Civil Procedure section 1008 to the effect that: "(a) When an application for an order has been made to a judge, or to the court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order

Having thus disposed of Ford's contentions, we are further confronted with the claim raised by Norma on her own appeal that the trial court erred in not allowing her defense costs pursuant to Code of Civil Procedure section 1038 which provides in part that: "(a) In any civil proceeding . . . for indemnity or contribution in any civil action, the fact finder, upon motion of the defendant or cross-defendant, shall, at the time of the granting of any summary judgment . . . determine whether or not the . . . cross-complainant . . . brought the proceeding with reasonable cause and in the good faith belief that there was a justiciable controversy under the facts and law which warranted the filing of the . . . cross-complaint. . . . If the fact finder should determine that the proceeding was not brought in good faith and with reasonable cause, an additional issue shall be decided as to the defense costs reasonably and necessarily incurred by the party or parties opposing the proceeding, and the court shall render judgment in favor of that party in the amount of all reasonable and necessary defense costs.

"(b) 'Defense costs,' as used in this section, shall include reasonable attorneys' fees, expert witness fees, the cost of services of experts, advisers, and consultants in defense of the proceeding, and where reasonably and necessarily incurred in defending the proceeding. . . ."

■ On this point it is, of course, the case that while a favorable ruling on a motion for summary judgment is a prerequisite to the recovery of the costs defined, the mere granting of such a motion does not effect entitlement to such costs, which accrues only upon a finding a cross-complaint for indemnity was brought without reasonable cause and a good faith belief there was a justiciable controversy under the facts and law which warranted the filing of the cross-complaint. The trial court found such reasonable cause and good faith belief to be present. The facts which we have recited herein adequately support that finding, even though they were insufficient to justify resolution of the primary issue in Ford's favor.

The judgment entered June 9, 1981, from which both appeals are taken is affirmed. Each party to bear the costs of her or its appeal.

Compton, J., and Beach, J., concurred.

---

may, within ten (10) days after knowledge of the order and based upon an alleged different state of facts may, make application to the same judge who made the order, to reconsider the matter and modify, amend or revoke the prior order."

It is enough to say we are satisfied that while an earlier motion for summary judgment was made in the proceedings, it did not serve to impede that which, agreeably with the direction of the court in *Fisher,* is now before us.