Filed 10/6/14  Arakelian v. Tufenkchian CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MANOUK ARAKELIAN, | B245472 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. EC053703) |
| v. | |
| AREGNAZAN TUFENKCHIAN, et al., | **ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT)** |
| Defendants and Respondents. | |

THE COURT:

It is ordered that the opinion filed September 17, 2014 and not certified for publication, be modified as follows:

1.  On page 19, beginning at line 11, the text reads as follows:

"Accordingly, we direct the trial court to reevaluate the declarations, conduct an evidentiary hearing if necessary, and examine the entire record in connection with the motion for a new trial to determine whether there was any jury misconduct, and if there was, if it was prejudicial.  (*Krouse v. Graham* (1977) 19 Cal.3d 59, 79-82 . . . ."

It should read:

"Accordingly, we direct the trial court to reevaluate the declarations, hear argument and examine the entire record in connection with the motion for a new trial to determine whether there was any jury misconduct, and if there was, if it was prejudicial.  (*Linhart v. Nelson* (1976) 18 Cal.3d 641, 645 [on motion for

new trial in a civil case, juror testimony to be presented by affidavit]; *Krouse v. Graham* (1977) 19 Cal.3d 59, 79-82 . . . .”

The petition for rehearing filed by respondent Artem Arakelyan is denied. The foregoing does not change the judgment.

_____

PERLUSS, P. J.,                WOODS, J.,                ZELON, J.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| MANOUK ARAKELIAN, | B245472 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. EC053703) |
| v. | |
| AREGNAZAN TUFENKCHIAN, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  William Stewart, Judge.  Remanded with directions.

The Yarnall Firm, Delores A. Yarnall; Martinian & Associates and Tigran Martinian for Plaintiff and Appellant.

Doherty & Catlow and Michael R. Blaise for Defendants and Respondents Aregnazan Tufenkchian and Jack Tufenkchian.

Law Offices of Gregory Lucett, Charles P. Wessler; Pollak, Vida & Fisher, Michael M. Pollak and Anna L. Birenbaum for Defendant and Respondent Artem Arakelyan.

_____

Manouk Arakelian, a passenger in a car involved in a collision, sued the drivers of the two cars involved and the spouse of one of the drivers. The jury determined that both drivers had been negligent but that the negligence had not been a substantial factor in causing injury to Arakelian. Arakelian appeals, alleging instructional error, entitlement to damages, and juror misconduct. We reverse the order denying Arakelian's motion for new trial and remand the matter to the trial court for the court to reconsider the motion.

## FACTUAL AND PROCEDURAL BACKGROUND

Arakelian was born in 1989. When he was 12 years old, he was involved in an automobile accident that caused him back and neck pain. At the age of 14 or 15 years, Arakelian was diagnosed with a spinal condition called "Schmorls nodes," in which disk materials protrude into vertebrae. These nodes may be asymptomatic or they may cause back pain.

In January 2007 Arakelian was involved in an accident. Following this accident an MRI (magnetic resonance imaging) showed a minimal disk bulge. He was in another automobile accident in July 2007. After both accidents Arakelian had chiropractic treatment. On December 31, 2008, Arakelian was involved in another automobile accident, this one causing him lower back pain with radiating pain down his leg; he again underwent chiropractic treatment. This treatment concluded on February 6, 2009.

On February 13, 2009, Arakelian was involved in the automobile accident that is the subject of this lawsuit. Arakelian was a rear seat passenger in a vehicle driven by Artem Arakelyan. Arakelyan's car was traveling straight through an intersection when it collided with a car, driven by Aregnazan Tufenkchian, that was turning left.

Arakelian sued the drivers of both cars for negligence. The matter was tried to a jury. All the occupants of each car testified, as did the husband of defendant Tufenkchian. Arakelian presented expert witnesses in biomechanics, neurosurgery, neuroradiology, life care planning, and economics, and the orthopedic surgeon who performed his spinal surgery. The jury found that both drivers had been negligent but that the negligence had not been a substantial factor in causing harm to Arakelian.

2

Arakelian unsuccessfully sought a partial new trial on damages based on allegations of jury misconduct, instructional error, and what he termed an inadequate damages award. Arakelian appeals the verdict and the denial of his new trial motion.

## DISCUSSION

On appeal, Arakelian contends that the cumulative effect of a series of errors at trial requires a new trial on damages.  We address each asserted error in turn.

### I.     Alleged Instructional Error

A.  Response to the Jury's First Question

Shortly after commencing deliberations, the jury sent out a note asking, "Please define as clearly as possible what is meant in question two [of the special verdict form[1]] by 'in causing <u>harm</u>' specifically."  The court conferred with counsel about how to respond to the inquiry.  Counsel for Arakelian initially suggested that the judge direct jurors to already-given instructions CACI Nos. 3927 and 3928; counsel argued that harm is "what is compensable under pain and suffering and under economic loss."  The court declined to direct the jury to those instructions because they pertained to damages. Instead the trial court looked to the instruction given to the jury in which the terminology of causing harm first appeared, CACI No. 400, and drew from the use note the definition of "harm," the underlined word in the jury's request for a definition.  The court proposed, based on the use note, that the jury be advised that the term "harm" encompasses loss, injury, and damage.  Arakelian's counsel expressed no opposition or objection to this definition and did not request any alternate or further language.  The court sent the jury the response, "Harm means 'loss' or 'injury' or 'damage' or any or all of them."

After the response was sent to the jury, and after a juror was replaced and deliberations began anew, plaintiff's counsel said regarding the response to the jury's question, "What we did was minimal.  If there's another question, I ask we give the

---

[1]     Question two asked, "Was the negligence of a defendant a substantial factor in causing harm to plaintiff?" and had a space next to each defendant's name for the jury to write "yes" or "no."

instructions that speak to emotional and physical condition." The court said that it would have to see what any further note asked, but that if the court had responded to the question any other way, "I think we would have been engaging in speculation as to what they meant. Since they underscored the word [']harm,['] they were interested in the definition. If not, they'll send out another question."

The following day, counsel for Arakelian filed a written request that the jury be given this further response to their question: "Additionally, the word 'harm' in this case may include aggravation of a pre-existing condition or disability. See jury instruction no. 3927." The court refused this request on the ground that the proposed language was not neutral and overemphasized the plaintiff's case.

Arakelian complains on appeal that "the jury did not ask only for the meaning of the word harm. It asked for the meaning of the term 'cause harm,' yet the court's response ignored the causation aspect of the jury's question." He also contends that the court should have instructed the jury that harm included the aggravation of a pre-existing injury. The propriety of jury instructions is a question of law that we review de novo. (*Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475.)

A party is entitled upon request to an instruction on each theory of the case that is supported by the pleadings and substantial evidence. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) "In instructing a jury it is sufficient if the court gives a well balanced statement of the essential legal principles necessary to guide them in their deliberations, and when that is done a party is not prejudiced by refusal to give an additional instruction merely because it may be said to be applicable to the case from the viewpoint of the party offering it." (*Cucamonga County Water Dist. v. Southwest Water Co.* (1971) 22 Cal.App.3d 245, 266 (*Cucamonga*).) A court may refuse a proposed instruction that is argumentative or when other instructions given adequately cover the legal point. (*Soule*, at p. 572; *Arato v. Avedon* (1993) 5 Cal.4th 1172, 1189, fn. 11.) "[I]t is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly

4

prominent although the instruction may be a legal proposition. [Citations.]" (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718.)

Here, the instructions already given to the jury, specifically CACI Nos. 430 and 3927, adequately discussed the legal point that Arakelian's proposed language concerned. CACI No. 430, as given, provided, "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." CACI No. 3927, as given, stated, "Manouk Arakelian is not entitled to damages for any physical or emotional condition that he had before [the defendants'] conduct occurred. However, if Manouk Arakelian had a physical or emotional condition that was made worse by [defendants'] wrongful conduct, you must award damages that will reasonably and fairly compensate him for the effect on that condition." These instructions adequately informed the jury concerning causation and aggravation of a pre-existing condition. Because Arakelian's proposed instruction was duplicative of the instructions already given and unduly emphasized his theory of the case, the court properly refused to give it. (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1217-1218.)

B. Response to the Jury's Second Question

It is unclear whether Arakelian contends that the court erred in responding to the jury's second question. In his brief, Arakelian asserts that the jury "showed its difficulty deliberating" by asking the court whether, if the jury could not agree on the answer to questions one and two of the special verdict form, it could deliberate on the other questions. The court answered that the jury could "deliberate or discuss the questions in any order," but that the jury "must <u>answer</u> the questions in the order they appear on the form." Arakelian's entire analysis of this response is that it "could have led the jury to believe that they had to find causation first, before they could apportion the harm between that which was pre-existing and not aggravated, and that which aggravated the

5

pre-existing condition as a result of the 2009 collision. It was unclear that the aggravation issue was part of the causation question." To the extent that Arakelian intends to claim error in the court's response to this question from the jury, that claim is foreclosed by his counsel's express agreement to the court's answer at trial. (*Ventura v. ABM Industries, Inc.* (2012) 212 Cal.App.4th 258, 271 [invited error doctrine applies when defendants agree to proposed jury instruction].)

### C. Mid-Deliberation Request for Additional Instructions

During jury deliberations, Arakelian asked the court to give the jurors additional instructions, CACI Nos. 431 and 434, concerning alternative and concurrent causation. The court refused to give these instructions. The trial court did not err.

CACI Nos. 431 concerns multiple causes of injury. It directs the jury that a person's negligence may combine with another factor to cause harm, and instructs that if the jury finds that a defendant's negligence was a substantial factor in causing the plaintiff's harm, that defendant is responsible for the harm. (CACI No. 431.) The defendant cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing the plaintiff's harm. (*Id.*) The concepts of this instruction were adequately covered by other instructions given by the trial court. Specifically, the court gave a version of CACI No. 400 that was modified at Arakelian's request to incorporate these principles of multiple causation: the jury was instructed that to establish a negligence claim, Arakelian had to prove: "1. That either Argenazan Tufenkchian or Artem Arakelyan or both of them was or were negligent; [¶] 2. That Manouk Arakelian was harmed; and [¶] 3. That either or both driver's [*sic*] negligence was a substantial factor in causing Manouk Arakelian's harm." Because other instructions covered the legal principles of CACI No. 431, the court did not err in denying this request. (*Cucamonga*, *supra*, 22 Cal.App.3d at p. 266.)

CACI No. 434 is designed to be used in the specific factual situation in which multiple defendants have engaged in negligent acts but the plaintiff cannot prove which defendant's acts caused his injuries. In that situation, the burden of proof of causation

6

shifts to the defendants to prove that the other defendant or defendants actually caused the injury. The doctrine is derived from *Summers v. Tice* (1948) 33 Cal.2d 80, in which two hunters shot in the plaintiff's direction, but the plaintiff could not establish which of the hunters' pellets caused his injuries. Because it was impossible to determine which defendant had fired the shot causing the injury, both defendants were held jointly and severally liable. (*Id.* at pp. 86-88.) The court concluded that both were negligent, and it was unfair to require the plaintiff to prove which defendant was responsible. (*Id.* at pp. 85-87.) Concluding the defendants were in a better position to offer evidence on the question of proximate causation, the court shifted the burden of proof to the defendants, "each to absolve himself if he can." (*Id.* at p. 86.) The doctrine also applies "when several negligent automobile drivers, not acting in concert, successively collide with a plaintiff's person or his property, and the resulting damage is not capable of apportionment, [and in that case] the burden 'shifts to any defendant who might have contributed to the injuries to prove his own innocence or limited liability by showing that such injuries or some particular injury did not result from his negligent conduct.' [Citations.]" (*Lareau v. Southern Pac. Transportation Co.* (1975) 44 Cal.App.3d 783, 791 (italics omitted) (*Lareau*).)

Arakelian has not established that the doctrine applies here. Here, there was a single injury arising out of a single event, and Arakelian has not demonstrated on appeal any reason to conclude that this two-car automobile accident action, complete with accident reconstruction testimony, resulted in an "inherent impossibility of apportioning the damages because of the type of injury involved." (*Lareau*, *supra*, 44 Cal.App.2d at p. 791.) The litigation did not proceed on the theory that it was impossible to determine which driver had caused Arakelian's injuries, and Arakelian has not established any point in the litigation prior to the request for these instructions in which a party advanced the theory that it was impossible to determine which of the drivers had proximately caused damage to Arakelian. As the court observed in response to Arakelian's request for this instruction, "That's not the way the case was tried in the first place." This belatedly submitted instruction, moreover, would have had the patently prejudicial effect of

7

shifting the burden of proof after the conclusion of the presentation of evidence, after closing argument, and during deliberations. Arakelian has not demonstrated any error here.

## II. Sufficiency of the Evidence to Support Finding of No Causation

Arakelian argues that the trial court should have granted his motion for a new trial because what he describes as "a zero damages verdict"[2] was improper. First, he argues that the damages were inadequate as a matter of law because no damages were awarded when the law required that some damages be awarded. Next, he contends that the "zero damages verdict" is not supported by sufficient evidence. Finally, he asserts that the verdict was against the law because the evidence compelled a finding that the collision caused him harm.

Arakelian's arguments, though presented as challenges to a non-existent damages award, are actually arguments concerning the sufficiency of the evidence to support the jury's finding that the negligence of the drivers was not a substantial cause of harm to him, for the question of appropriate damages is never reached if the jury's negative finding on the element of causation is supported by the evidence. (*Edwards v. A.L. Lease & Co.* (1996) 46 Cal.App.4th 1029, 1034 [tort liability is generally dependent upon the plaintiff's ability to demonstrate that his or her damages were caused by the defendant]; *Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1509 [if negligent conduct does not cause damage, there is no tort liability].)

Reviewing the verdict for the sufficiency of the evidence (*Pedeferri v. Seidner Enterprises* (2013) 216 Cal.App.4th 359, 371-372), we conclude that the evidence is sufficient to support the jury's determination that drivers' negligence was not a substantial factor in causing harm to Arakelian. Arakelian had pre-existing back problems and had been injured in prior accidents, including one that had occurred only weeks before the collision that formed the basis for this lawsuit. There was a conflict in

---

**2** Arakelian mischaracterizes the verdict, as the jury found against him on the element of causation rather than failing to award damages.

the evidence as to whether at the time of the subject collision Arakelian had completely recovered from his late 2008 accident injuries. Evidence was presented at trial that the accident between Arakelyan and Tufenkchian was not sufficient to cause the disk damage that Arakelian claimed it had, but could at most have caused a small soft tissue injury. Arakelian, moreover, admitted that he felt no back pain at the scene of the accident despite his claim that the collision caused a herniated disk. There was also evidence that shortly after the accident, Arakelian and the other two individuals who were in that car were laughing, joking, and smoking cigarettes. Arakelian did not go to the hospital or to any medical professional the day of the accident. Despite what he claimed was the onset of excruciating pain the night after the accident, Arakelian did not go to the hospital the following day, the day after, or the day after that. Arakelian saw a chiropractor four days after the incident, and he did not see a medical doctor until five months after the accident. Moreover, there was evidence that when he sought medical care and testing, Arakelian attributed his injuries to a prior car accident and not to the subject collision, and he described the onset of his symptoms as "years" earlier. Based on this evidence, the jury could conclude that the negligence of Arakelyan and Tufenkchian was not a substantial factor in causing harm to Arakelian.

Arakelian makes much of his "primary right" to be free of being subjected to a car accident, stating that it is his indivisible right to be free from actions that breached duties to him. The invasion of a primary right, however, does not demonstrate that the negligence of the parties was a substantial factor in causing damage to him, and it is this element that was decided adversely to him at trial.

Arakelian claims that the evidence was undisputed that he was harmed and asserts that the parties and experts all agreed that he was emotionally and physically harmed by the collision. The record does not support Arakelian's oft-repeated claim that his injuries and needs were undisputed. Whether Arakelian was emotionally damaged by the accident was in dispute due to the evidence of his conduct immediately the collision, when he and the other occupants of the car were "smoking, joking, laughing, pacing to and fro and laughing." Whether the collision caused physical harm to Arakelian was also

9

contested. While Arakelian presented evidence to support his claim that the accident caused a back injury, assertedly a herniated disk, the defense presented testimony that the accident did not generate enough force to cause a disk failure or anything more than lower back muscle strain. The defense medical expert, Philip Kanter, testified that "at worst" Arakelian could have sustained a minor soft-tissue injury from the collision such as a strain or a sprain, and he was equivocal in his testimony about whether such a soft-tissue injury had occurred. In light of the evidence set forth above there was a conflict in the evidence as to whether the negligence of the drivers was a substantial factor in causing harm to Arakelian.

Arakelian claims that defendant driver Arakelyan "*admitted* that Manouk [Arakelian] was seriously physically injured in the accident based on his own observations of Manouk before and after the collision." We have reviewed the testimony Arakelian relies upon and find that the record fails to support his contention. Driver Arakelyan testified that after the accident he dropped Arakelian off at home before going on with his evening plans because Arakelian was shaken up, did not feel well, and wanted to lie down. Some time after the day after the accident, Arakelian told Arakelyan that he did not feel well as a result of the accident, and that he was feeling pain that he attributed to the accident. Arakelian acted like he was in pain and did not play sports anymore. Arakelyan went to see Arakelian in the hospital before his back surgery and saw that Arakelian was in pain. Arakelyan answered affirmatively a question asking whether he "understood that it [Arakelian's pain] was because Ms. Tufenkchian had turned left in front of you?" Arakelyan's testimony was far from an admission that the collision had seriously injured his friend. Arakelyan saw no serious injuries to Arakelian at the time of the collision; he heard from Arakelian at an unknown point afterwards that he was in pain that he attributed to the collision; he observed Arakelian in pain immediately before the later back surgery; and he testified to his "understanding," though no information was elicited to give any basis for this conclusion, that Arakelian's injuries were Tufenkchian's fault. None of this evidence compelled the jury to find that the negligence of the drivers had been a substantial factor in causing damage to Arakelian.

10

The jury remained free to accept the expert testimony that the collision was not forceful enough to cause the severe injuries and vast damages that Arakelian claimed.

Finally, Arakelian claims that "all agreed" that Arakelian required past and future medical care as a result of the accident. Although at trial there was a tremendous dispute as to what medical care was necessitated by the collision, Arakelian bases his claim of consensus on the testimony of Kanter. Concerning past care, Kanter testified that if Arakelian did in fact sustain a soft-tissue injury, he would have required a doctor's visit and three or four weeks of physical therapy. As we have already noted, Kanter was equivocal about whether Arakelian had in fact sustained a soft-tissue injury; and the only medical bills Kanter believed related to the subject accident were the one for chiropractic treatment and one for a consultation with the orthopedic doctor, although even that consultation was "[p]robably not necessary." Kanter's assumption or opinion that Arakelian sustained a minor soft-tissue injury from the collision does not mean that the jury had to accept or conclude that such an injury occurred. Although Arakelian argues that uncontradicted expert testimony on a matter solely within the knowledge of experts is conclusive and cannot be disregarded by a jury, citing *Huber, Hunt & Nichols, Inc. v. Moore* (1977) 67 Cal.App.3d 278, 313, he has not established that the question of whether the negligence of the drivers here caused injury to Arakelian is within the knowledge of experts only and not within common knowledge. The jury was presented with conflicting evidence as to the nature, extent, and possible causes of Arakelian's back problems, and it did not have to accept the evidence that Arakelian had been injured by the subject collision. "As to the extent of the injuries claimed, the jury was not bound by the doctors' testimony or by that of plaintiff" (*Gersick v. Shilling* (1950) 97 Cal.App.2d 641, 649), but was free to consider all of the evidence presented at trial in determining whether the negligence of the drivers was a substantial cause of harm to Arakelian.

Concerning future care, Kanter opined that because Arakelian had back surgery it would be reasonable to expect that he would see an orthopedic surgeon once every five years to follow up on it; this was also reflected in the defense life care plan. Kanter did not, however, believe that the subject collision caused an injury requiring surgery, noting

11

that any soft-tissue injury Arakelian sustained in the collision was "not a surgical condition" and stating that surgery would have been performed because of Arakelian's pre-existing spinal problems. Therefore, notwithstanding Kanter's agreement that Arakelian would require future periodic consultations with an orthopedic surgeon "due to his spine surgery," the jury was not required to find that this ongoing medical need was attributable to the negligence of the drivers here. The jury could easily have concluded that Arakelian's future appointment needs were not a result of the subject collision but of a surgery that was performed due to his pre-existing conditions. Arakelian has not established any error.

### III. Request for a New Trial Based on Juror Misconduct

Arakelian also sought a new trial on the grounds of juror misconduct. (See Code Civ. Proc., § 657, subd. 2.) He submitted four juror declarations in support of his misconduct claims. Pursuant to Evidence Code section 1150, the trial court excluded two declarations in their entirety, and ruled admissible one paragraph of a third declaration (by Diane Livio) and two paragraphs of a fourth declaration (by Benjamin Lee). In considering Arakelian's misconduct claims, the court decided that still more portions of the three paragraphs it had admitted were inadmissible, then concluded that no prejudice could have resulted from the limited amount of claimed misconduct that it considered.

#### A. Applicable Law

When a party seeks a new trial based on jury misconduct, the court undertakes a three-step inquiry. (*People v. Duran* (1996) 50 Cal.App.4th 103, 112 (*Duran*).) First, the court must determine whether the declarations offered in support of the motion are admissible under Evidence Code section 1150, subdivision (a). If the declarations are admissible, the court must next consider whether the moving party has established that misconduct occurred. (See *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625 ["The moving party bears the burden of establishing juror misconduct"].) Finally, assuming misconduct is found, the court must determine whether

12

it was prejudicial. (*Duran*, at p. 113.) Juror misconduct raises a rebuttable presumption of prejudice. (*People v. Merriman* (Aug. 18, 2014, S097363) ___ Cal.4th ___ [2014 DJDAR 11123, 11159.) The presumption of prejudice "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417, disapproved on other grounds in *Soule*, *supra*, 8 Cal.4th at p. 580.)

"On review from a trial court's 'determin[ation of] whether misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.]"' [Citations.]" (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345 (*Barboni*).) "[I]t is the trial court that must assess the credibility of affiants or declarants, and the trial court is entitled to believe one over the other." (*Whitlock v. Foster Wheeler* (2008) 160 Cal.App.4th 149, 160.)

When the trial court denies a motion for a new trial submitted on affidavits, we view the affidavits "in the light most favorable to the [prevailing party]" (*Gordon v. Gordon* (1954) 126 Cal.App.2d 481, 486) and "assume the . . . court impliedly resolved [any evidentiary] conflicts in favor of the prevailing party." (*Andrews v. County of Orange* (1982) 130 Cal.App.3d 944, 957, disapproved on other grounds in *People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5; *Young v. Brunicardi* (1986) 187 Cal.App.3d 1344, 1350-1351.) However, any uncontroverted acts set forth in the moving party's affidavits are "deemed established." (*Tapia v. Barker* (1984) 160 Cal.App.3d 761, 766 (*Tapia*).) When the trial court has denied a motion for new trial, we review the record independently to determine whether any established conduct amounts to juror misconduct and whether such misconduct is prejudicial. (See *People v. Collins* (2010) 49 Cal.4th 175, 242.)

## B. Trial Court Evidentiary Rulings

Arakelian contends that the court erred by excluding evidence of overt acts evidencing misconduct when it ruled on the admissibility of the four juror declarations. We review the trial court's determination regarding admissibility of affidavits offered to support the motion for new trial on grounds of juror misconduct for an abuse of discretion. (*Barboni*, *supra*, 210 Cal.App.4th at p. 345.)

The admissibility of evidence to test a verdict is governed by Evidence Code section 1150. "The Legislature has declared that evidence of certain facts is admissible to impeach a verdict: 'Upon an inquiry as to the validity of a verdict, *any otherwise admissible evidence may be received as to statements made*, or conduct, conditions, or events occurring, either within or without the jury room, *of such a character as is likely to have influenced the verdict improperly*.' (Evid. Code, § 1150, subd. (a), italics added.) It is settled that jurors are competent to prove 'objective facts' under this provision. [Citation.]) By contrast, the Legislature has declared evidence of certain other facts to be inadmissible for this purpose: 'No evidence is admissible to show *the effect* of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.' (Evid. Code, § 1150, subd. (a), italics added.) Thus, jurors may testify to 'overt acts'—that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject to corroboration'—but may not testify to 'the subjective reasoning processes of the individual juror . . . .' [Citation.]" (*In re Stankewitz* (1985) 40 Cal.3d 391, 397-398.) "Among the overt acts that are admissible and to which jurors are competent to testify are statements. Section 1150, subdivision (a), expressly allows proof of 'statements made . . . either within or without the jury room . . . .'" (*Id*. at p. 398.)

"Cases where there was an overt act that in and of itself was improper, such as a juror reading a novel during the taking of testimony or a juror's consultation with an attorney for advice on the law applicable to the case [citation], are the relatively easy

14

ones to resolve. The matter becomes more difficult when it is not an overt act but a statement from a juror that is claimed to constitute misconduct. To be precise, there are usually two statements in such cases; there is a declaration (statement) by one juror who reports the statement of another juror. The focus is, of course, on the second statement." (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 787.) Such is the case here. With the exception of alleged independent visits to the scene of the accident, the misconduct alleged by Arakelian involves statements made by jurors and related by other jurors. Statements "must be admitted with caution" because they have "a greater tendency than nonverbal acts to implicate the reasoning processes of jurors—e.g., what the juror making the statement meant and what the juror hearing it understood. They are therefore more apt to be misused by counsel in an effort to improperly open such processes to scrutiny. But no such misuse is threatened when . . . the very making of the statement sought to be admitted would itself constitute misconduct. Such an act is as much an objective fact as a juror's reading of a novel during the taking of testimony [citation], or a juror's consultation with an outside attorney for advice on the law applicable to the case [citation]." (*In re Stankewitz*, *supra*, 40 Cal.3d at p. 398.)

Accordingly, evidence of a jury discussion on an improper topic is admissible as an overt act, provided that the evidence is not directed at the subjective reasoning processes of the individual juror. (*People v. Perez* (1992) 4 Cal.App.4th 893, 907 (*Perez*) [inquiry into juror's statement that jury found the defendant guilty because he did not testify did not violate Evidence Code section 1150 because it did not require investigation into the subjective reasoning processes of the individual jurors].) Specifically, evidence of a jury's explicit or implicit agreement to violate a court's instruction does not touch on jurors' subjective reasoning processes. (*Perez*, at p. 908; see also *DiRosario v. Havens* (1987) 196 Cal.App.3d 1224, 1238 [statements between jurors regarding the court's authority to reduce an excessive jury award are admissible overt acts]; *Moore v. Preventive Medicine Medical Group, Inc*. (1986) 178 Cal.App.3d 728, 740, fn. 8, 742-743 [holding admissible declarations containing juror statements that possibly indicated disregard of trial court's admonition not to draw any inference of liability from a party's

15

out-of-court settlement]; *Tramell v. McDonnell Douglas Corp.* (1984) 163 Cal.App.3d 157, 172-173 [holding juror comments during deliberations regarding effect of attorney's fees and income taxes on damage award to be "overt conduct, objectively ascertainable," evidencing an implied agreement to inflate verdict in compensation].)

Here, Arakelian submitted four declarations; from that the trial court found three paragraphs to be admissible, then narrowed the evidence down further by concluding that portions of at least one of those previously-admitted paragraphs were also not admissible. The declarations are far from a model of clarity: admissible allegations of overt acts are intertwined with inadmissible statements about the thought processes of the jurors, sometimes within a single sentence. Nevertheless, it appears from our review of the excluded material that the trial court's evidentiary rulings swept too broadly, having the effect of excluding from evidence allegations of "statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly." (Evid. Code, § 1150, subd. (a).) For instance, juror Livio declared, "[A]t least one juror, no. 10, kept declaring that, because the case involved significant sums of money, he would demand 100% proof as cause, rather than more than 50%, which was what I understood to be the instructions given us. Other jurors agreed that, as far as they were concerned, the amount of money sought increased the plaintiff's burden of proof above the 'more than 50%' standard." Of course the phrase, "which was what I understood to be the instructions given us," was inadmissible as a statement of this juror's understanding of the instructions. (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1125 [juror declarations inadmissible to the extent that they purport to describe the jurors' understanding of the instructions].) The remaining content, however, concerned overt acts: one juror's statement that he would not follow the instructions given to the jury regarding the burden of proof on causation,[3] and an agreement by jurors to impose a

---

[3] The jury was instructed with CACI No. 200: "A party must persuade you, by the evidence presented in court, that what he or she is required to prove is more likely to be true than not true. This is referred to as 'the burden of proof.' [¶] After weighing all of

16

higher standard of proof in light of the amount of damages sought in this action. This evidence should have been admitted. "Evidence of a jury's explicit or implicit agreement to violate a court's instruction does not touch upon the jurors' subjective reasoning processes, since as in [*In re*] *Stankewitz*, such agreement in and of itself constitutes misconduct." (*Perez, supra*, 4 Cal.App.4th at p. 908.)

Similarly, the court erred when it excluded the portion of a juror declaration stating that one juror said that she would not award damages against one of the defendants because it was not clear if there was insurance. The statement is inadmissible for the purpose of demonstrating the actual effect of the consideration of the issue of insurance on this or any other juror's mental process. (Evid. Code, § 1150, subd. (a).) However, it may be considered for the limited purpose of showing that a juror injected the consideration of insurance into the deliberations, contrary to the express instructions of the trial court.[4] Juror discussion about a party's insurance coverage is a quintessential example of misconduct. (See, e.g., *Tapia, supra*, 160 Cal.App.3d at p. 766, and cases cited [consideration of collateral sources of compensation is outside the evidence, contrary to the court's instruction on damages, and improper].)

The court also excluded evidence of a juror who was a nurse bringing into deliberations outside information bearing on the issue of whether Arakelian was damaged by the subject collision. Interspersed among inadmissible statements in the declaration of juror Livio is her statement that juror Alice Abramian said that "what she knows from her outside medical knowledge informed her that no injury could have resulted from her accident, regardless of the evidence presented at trial. She said, in words to the effect,

---

the evidence, if you cannot decide that something is more likely to be true than not true, you must conclude that the party did not prove it. You should consider all the evidence, no matter which party produced the evidence. [¶] In criminal trials, the prosecution must prove that the defendant is guilty beyond a reasonable doubt. But in civil trials, such as this one, the party who is required to prove something need prove only that it is more likely to be true than not true."

[4]     The jurors had been instructed that they "must not consider whether any of the parties in this case has insurance." (CACI No. 105.)

17

that the 'injury could not happen based on her own experience.'" The trial court ruled this evidence inadmissible as a verbal reflection of the juror's mental processes, but this statement is prima facie evidence raising the question of whether outside information was introduced into deliberations. Because the trial court excluded this evidence, it never determined whether Abramian made such statements, and if she did, whether she used her medical "background in analyzing the evidence, which is appropriate," or whether it shows she "inject[ed] 'an opinion explicitly based on specialized information obtained from outside sources,'" which is misconduct. (*People v. Steele* (2002) 27 Cal.4th 1230, 1266 (*Steele*).)

The court also excluded other evidence concerning the introduction of outside information into deliberations. Specifically, juror Livio declared that "Juror No. 9, Michael Cheng, relied upon and related to the other jurors his experience (and distrust) of chiropractors, his experience with his back injury, what his own doctor told him about how one can injure a back, and stated words to the effect that he believed what his own doctor told him more than he would accept the witnesses in this case. He said, as best I recall[,] 'I don't care what these doctors say, I trust my own doctor.'"[5] The court said that this evidence given by Livio was not admissible because it was Cheng's identification of his reasons for his vote, a verbal reflection of his mental processes. This statement is evidence of an overt act: a juror bringing into deliberations the outside information of what his doctor had said were the means of sustaining a back injury. "'[A] statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419; see also *Steele, supra,* 27 Cal.4th at p. 1265 ["portions of the [juror] declarations [that] involved statements made . . . within the jury room" are admissible].)

---

**5** A similar report was made by juror Emma Escalera, who declared that Cheng told the other jurors "that he relied on his own experience with his back and what his doctors had told him instead of the evidence in this case." As the court excluded Escalera's declaration in its entirety, it did not comment on this statement in its minute order.

The court's overly broad exclusion of the evidence of juror misconduct was inconsistent with Evidence Code section 1150, and it was an abuse of discretion. Because the court excluded the vast majority of the admissible evidence and limited its consideration of issues to alleged misconduct that could not have prejudiced Arakelian, the court did not hold a hearing on juror misconduct; it never evaluated the sufficiency of the full range of admissible evidence to establish misconduct; it did not consider the evidentiary showing in response to the moving party's declarations; and it did not resolve the evidentiary conflicts raised by the competing juror declarations. As a result, there exist no credibility determinations or findings of fact to review for substantial evidence, and this court is not in a position to make these credibility determinations and resolve evidentiary conflicts in the first instance. Accordingly, we direct the trial court to reevaluate the declarations, conduct an evidentiary hearing if necessary, and examine the entire record in connection with the motion for a new trial to determine whether there was any jury misconduct, and if there was, if it was prejudicial. (*Krouse v. Graham* (1977) 19 Cal.3d 59, 79-82 [vacating order for new trial and directing the trial court to admit declarations that had been erroneously excluded under Evidence Code section 1150, then to weigh evidence and reconsider the motion], *Perez*, *supra*, 4 Cal.App.4th at pp. 908-909 [remanding for new consideration of new trial motion where original motion based on court's "worst case scenario" assumption of misconduct]; see also *People v. Von Villas* (1992) 11 Cal.App.4th 175, 258-260 [remanding for new hearing and ruling on juror misconduct where errors in the promulgation and admission of evidence and the application of an incorrect legal standard resulted in the trial court never testing the credibility of jurors in question]; *People v. Bryant* (2011) 191 Cal.App.4th 1457, 1471 [remanding for "a full and complete hearing with competent evidence" on misconduct after motion for new trial was submitted and decided on statements that failed to meet statutory requirements for affidavits].) In performing this review, however, the court should not consider issues of juror misconduct that concern only the issue of negligence,

19

such as jurors' supposed independent visits to the scene of the accident[6] or certain jurors' alleged bias against young Armenian male drivers,[7] for such alleged misconduct could not have been prejudicial to Arakelian given the verdict in this case.

---

[6] While independent visits by a juror to the scene of events constitute misconduct (*Anderson v. Pacific Gas & Elec. Co.* (1963) 218 Cal.App.2d 276, 280), we cannot conceive of any prejudice that could possibly have resulted from a site visit in light of the jury's determination that both drivers were negligent. As the trial court noted, "[I]t taxes the imagination to claim that such actions are prejudicial to plaintiff—he won on liability (negligence of the drivers) and that is the only issue such actions could relate to!"

[7] Juror Livio alleged that Juror No. 2 was "very biased against the 'young Armenian male driver' and said things that stereotyped them and that had nothing to do with matter that was in evidence. For example, she said teenagers always speed, especially male teens, and especially Armenian young males, and that these guys were essentially teens, and thus she was sure they were speeding or talking on their cell phones and not paying attention, although this was based on her pre-conceived biases and not on evidence presented. [¶] Other jurors said they believe, too, that Artem [Arakelyan, the driver of the car in which Arakelian was riding] was probably on the telephone or texting, although there was no evidence presented on this point." Juror Escalera declared that Juror No. 8 "said too that 'young Armenian boys' are always getting into trouble, and that she was sure that Artem [Arakelyan] 'was probably on his cell phone' at the time of the collision, although there was no evidence of this." According to Escalera, "The older Armenian juror with a goatee agreed with the stereotypes, too, as did juror no. 2, and relied on these views instead of the evidence." Leaving aside the obvious inclusion of abundant inadmissible statements in these passages, these statements pertain only to the element of negligence and only to the young male Armenian driver here, defendant Arakelyan; they therefore cannot have prejudiced Arakelian, in whose favor the question of Arakelyan's negligence was decided.

**DISPOSITION**

The order denying the motion for a new trial is reversed, and the judgment is conditionally reversed. The trial court is directed to rule on the motion for a new trial in accordance with this opinion. On remand, if the motion for new trial is denied, then the judgment shall be reinstated. If the motion for new trial is granted, then the trial court shall vacate the judgment and proceed with a new trial on the issues of causation and damages. Appellant shall recover his costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.

21